## THE YOUNGSTOWN MINES CORPORATION v. CLARENCE PROUT, COMMISSIONER OF CONSERVATION.

124 N. W. (2d) 328.

October 18, 1963—No. 38,615.

452

454

*Walter F. Mondale,* Attorney General, *Frank J. Murray,* Deputy Attorney General, and *Gordon C. Moosbrugger,* Special Assistant Attorney General, for appellant.

*Nye, Sullivan, McMillan, Hanft & Hastings* and *Donald D. Harries,* for respondent.

NELSON, JUSTICE.

On February 20, 1958, The Youngstown Mining Corporation (hereinafter referred to as Youngstown), pursuant to Minn. St. 6.136, submitted to the commissioner of conservation a verified claim for re-

fund of royalties it had paid the state under a mineral lease covering a portion of the bed of Rabbit Lake. The claim for refund was based on a provision of the lease respecting the ownership of the ores mined under it; the findings, conclusions, and judgment stipulated for in an action by the state to reform the lease; and a judgment, entered in a subsequent action, which determined that the state had no right, title, or interest in the bed of Rabbit Lake.

The commissioner on September 3, 1959, disapproved the claim for refund. In November 1959 the Ramsey County District Court issued a writ of certiorari on the petition of Youngstown directed against the commissioner and the state auditor to obtain review of the disapproval of the claim. The state moved to dismiss the petition, quash the writ, or for summary judgment. Thereafter, in December 1960 the district court determined that Youngstown was entitled to approval of its claim for refund and to have the claim transferred by the commissioner to the auditor for payment. On October 20, 1961, the court upon motion of the state ordered the writ quashed as to the auditor, but denied its motions for other relief and vacated the commissioner's disapproval of the claim for refund, incorporating in this order its earlier determination in Youngstown's favor and remanding the claim to the commissioner. He appeals to this court from the order of October 20.

On June 4, 1924, Rogers-Brown Ore Company (now Youngstown) entered into a 50-year lease with the State of Minnesota. The lease covered a portion of the bed of Rabbit Lake, Crow Wing County, and its purpose was to allow the company to extract iron ore from that area of the lakebed.

The lease was drawn pursuant to L. 1917, c. 110, approved March 26, 1917. Section 1 of that statute empowered designated state officers to enter into contracts or agreements "for the mining and disposing of the iron ore situate under any waters of any public lake or river in the state of Minnesota." Section 2 provided that:

"The principal of all funds arising from the disposal of such iron ore shall forever be preserved inviolate and undiminished and shall be added to the permanent school fund of the state to be invested and re-invested as provided by law * * *."

Pertinent portions of the lease in question (par. XI[2]) state:

"If any dispute shall arise as to the ownership of the ore covered by this contract or the title to the royalty payable for the mining thereof, it is mutually agreed that until such ownership or title is finally determined all payments thereafter required to be made hereunder shall be deposited at interest with the *Citizens State Bank of Brainerd, Minnesota,* and shall be held by it *until such ownership or title is finally determined by agreement of the parties or in an action brought to determine the ownership of said ore, or to determine the title to the moneys so deposited, which action may be brought by the party of the first part or by a claimant thereto,* at which time all of said accumulated moneys with interest shall forthwith be paid out as follows:

"If such owner or owners be some person or persons other than the State of Minnesota such portion, if any, of said moneys and interest as such owner or owners is entitled to, under any contract with the Party of the Second Part, shall be paid to such owner or owners, and such portion thereof as the State of Minnesota is entitled to shall be paid to it, and the remainder shall be paid to the Party of the Second Part, all in accordance with such final agreement or decision.

"If such owner or owners be some person or persons other than the State of Minnesota the obligation of the Party of the Second Part to pay royalties, either as minimum or otherwise as hereinbefore required, shall cease, and thereafter the Second Party shall pay into the Treasury of the State of Minnesota, a rental of One Hundred ($100.00) Dollars per year for the exclusive use of such rights, easements and privileges as the State of Minnesota may have in said premises and the waters therein, said rent to be paid in advance on or before the anniversary date of this agreement in each year." (Italics supplied in part.)

In May 1943 an action was commenced by William Petraborg and others to restrain Zontelli Brothers and Youngstown from constructing a dam and draining the eastern section of Rabbit Lake in connection with certain contemplated mining activities. A permanent injunction was granted by the district court and was affirmed on appeal to this

court. Petraborg v. Zontelli, 217 Minn. 536, 15 N. W. (2d) 174. The commissioner here contends that the Petraborg case may have "upheld the navigability of that body of water [Rabbit Lake]." That position is completely untenable, however, in the face of this court's statement in that case (217 Minn. 545, 15 N. W. [2d] 179):

"* * * Who would be the owner of the lake bed in the event of drainage and whether the taking would be for a public use are questions not necessary or proper for us here to consider."

Ownership of the bed of Rabbit Lake was directly in issue in State v. Adams, 251 Minn. 521, 89 N. W. (2d) 661, certiorari denied, 358 U. S. 826, 79 S. Ct. 45, 3 L. ed. (2d) 67. In that case we said (251 Minn. 559, 89 N. W. [2d] 687):

"The state relies upon Petraborg v. Zontelli, 217 Minn. 536, 15 N. W. (2d) 174, in support of a claim that it has been determined that Rabbit Lake, one of the bodies of water involved in the present proceeding, has previously been held navigable contrary to the present decision. * * * Therein both parties *conceded* that, for the purpose of such litigation, Rabbit Lake is a public body of water governed by laws applicable to public or navigable lakes and accordingly we were not required to pass upon the question."

The only further reference to the Petraborg case we need consider appears in the findings in State ex rel. Burnquist v. Zontelli, which was an action, fully discussed hereinafter, brought by the state in the Crow Wing County District Court in June 1943. The findings in that case incorporate an order by the Department of Conservation allowing defendants to alter the current and cross-section of Rabbit Lake and to make use of the waters therein to further projected mining operations, but expressly stating:

"Provided that none of the acts herein authorized shall be commenced or performed until:

* * * * *

"Applicant has furnished evidence satisfactory to the Attorney General that the order for injunction in the case of William O. Petraborg,

et al vs. Emil Zontelli, et al, and any injunction issued pursuant thereto has been vacated, dissolved or modified so as not to prohibit the acts authorized hereby."

(We may properly assume that the foregoing evidence was submitted satisfactorily since defendants apparently proceeded with their proposed plan for dewatering the lake and mining the ore.)

The action in which the foregoing findings were entered (Crow Wing County District Court File No. 19547) was brought by the attorney general against Emil Zontelli and Henry Zontelli, copartners doing business as Zontelli Brothers, Youngstown, Citizens State Bank of Brainerd, and First and American National Bank of Duluth. We shall refer to it hereinafter as State v. Zontelli.

The complaint in State v. Zontelli alleged that par. XI(2) of the original lease was unauthorized by law, beyond the power and authority of the state officials executing the lease to agree to, and beyond the scope of the notice for bids. It further alleged that no part of the consideration required to be paid under the lease had been paid into the state treasury but, on the contrary, had been deposited in an escrow account in the defendant banks. The state alleged that Youngstown, for the accomplishment of planned mining operations, had employed defendants Zontelli to construct a dike across the center of Rabbit Lake and intended to drain a major portion of the lake at the rate of 15,000 gallons per minute; that such pumping might have a deleterious effect on the state's control of water flowing from the lake; that no drainage permit had been obtained; that the proposed drainage plan might be of detrimental consequence to riparian owners on the lake, resulting in substantial claims against the state; and that Youngstown had conspired with certain riparian owners to effect drainage of the lake so that after drainage was complete Youngstown would claim ownership of the ore in an attempt to defeat the state's right to collect any royalty for ore mined therefrom. In its prayer for relief the state asked that defendants be restrained and enjoined from continuing with the proposed plan; that the lease be reformed and corrected to conform to the statutes; that defendant banks be ordered to remit to the state treasurer all funds paid into the escrow accounts,

or, in the alternative, that the court declare the whole lease null and void.

Thereafter, on October 15, 1943, the parties entered a stipulation of facts and for judgment. After hearing and pursuant to the stipulation, findings of fact, conclusions of law, and order for judgment were entered by the district court November 22, 1943. Judgment was entered January 20, 1944, ordering that all the ore royalties paid by Youngstown to the defendant banks under the escrow agreement in the lease should be paid over to the state treasurer and credited to the school trust fund. The judgment further decreed:

"* * * that the lease dated June 4, 1924, executed on behalf of the State of Minnesota, as party of the first part, to the Rogers-Brown Ore Company be, and the same hereby is, reformed by striking therefrom Section XI (2) * * *: [Quoted above.] And, by renumbering (3) of said Section XI as (2) thereof. Provided, however, that the elimination of the last paragraph of said Section XI (2) from said lease shall not be construed as a waiver of any claim which may be asserted by any party hereafter that the provisions of said last paragraph constituted a portion of the consideration for the issuance of the permit to drain Rabbit Lake, executed pursuant to Laws 1915, Chapter 78, which permit ran to the Rogers-Brown Ore Company * * * and if any claim that such provisions of Section XI (2) constituted a portion of the consideration for the issuance of that permit and that such permit was valid be sustained, then the covenant to pay therein contained may be deemed as in force and effect as a part of the permit issued under Laws 1915, Chapter 78."

The judgment further provided:

"* * * that said Lease of June 4, 1924, as so re-formed and all the remaining provisions thereof, is a valid and binding contract between the parties; provided, however, that in the event it is finally determined by any final judicial determination that the state is not the owner of the ore in the bed of Rabbit Lake, the covenant to pay the royalties and rentals stipulated in Sections IV and VI of said lease, shall fail for lack of consideration therefor.

* * * * *

"\* \* \* that The Youngstown Mines Corporation has, irrespective of the ownership of the ore in the bed of the lake, by virtue of the lease as herein re-formed, the permit issued under Laws 1915, Chapter 78 herein referred to and the permit contained in the order of the Commissioner of Conservation as set forth in the findings of the Court herein, full and complete right and authority to do all of the things authorized in such instruments to be done.

"\* \* \* that the causes of action set forth in plaintiff's complaint herein as against the defendants \* \* \* [Zontelli Brothers] be and hereby is dismissed without prejudice and without costs against any party.

"\* \* \* *that the temporary restraining order entered herein be dissolved and that the injunctive relief prayed for in plaintiff's complaint be and hereby is denied without costs to any party.*" (Italics supplied.)

The commissioner, in the instant action, construes State v. Zontelli in the following manner:

"\* \* \* Among the objects of this action \* \* \* was the recovery of all rentals paid into escrow up to that time, and the reformation of the lease \* \* \* so as to make the lease legal. In other words, this was an action for rent, among other things. \* \* \* The state's right to those rentals is firmly established: first, as a matter of contract, by the terms of the lease as amended; second, as a matter res judicata, by the judgment in the Zontelli case; third, by laches, running against the relator since this case was settled on the 15th day of October, 1943; fourth, by estoppel by accord and satisfaction of the dispute as to who was entitled to receive the rents."

■ We shall consider the foregoing contentions separately. The first, that State v. Zontelli was an action for rent, is untenable. The method of the payment of royalties was involved. The complaint sought equitable relief, i. e., a restraining order or injunction against Youngstown's plan to dewater the lake and mine the ore, and reformation of the lease by striking those provisions *pertaining to the deposit of royalties in escrow.*

It has been held that equity has no jurisdiction in an action for rent. See, Merrell v. Atkin, 29 Ill. 469; 52 C. J. S., Landlord and Tenant, § 552; and Beacom v. Daley, 164 Neb. 120, 124, 81 N. W. (2d) 907, 911, where it was stated:

"* * * Ordinarily a court of equity has no jurisdiction of an action for rent and claims for unpaid rent are separate and distinct causes of action for each term or payment involved."

The principal thrust of the litigation in State v. Zontelli was to strike the escrow provisions of the lease so as to allow the state to gain possession and control of royalties already paid by Youngstown. The complaint did not allege that agreed royalties had not been paid but merely that the escrow provisions were invalid. The fact that a disputed title remained was carefully preserved in the judgment, which expressly stated:

"* * * said Lease of June 4, 1924, as so reformed and all the remaining provisions thereof, is a valid and binding contract between the parties; *provided, however, that in the event it is finally determined by any final judicial determination that the state is not the owner of the ore in the bed of Rabbit Lake, the covenant to pay the royalties and rentals stipulated in Sections IV and VI of said lease, shall fail for lack of consideration therefor.*" (Italics supplied.)

Thus, while the reformation decreed in State v. Zontelli succeeded in transferring the funds from the escrow accounts to the school fund, its effect was, by the foregoing portion of the judgment, simply to change the agreed-upon depository and it did not affect any right or title to the payments.

■ The commissioner's second contention in regard to the Zontelli judgment is that under the principle of res judicata Youngstown is barred from claiming refund of royalties paid. However, as we have demonstrated, State v. Zontelli was an action to reform the escrow provisions of the lease and to obtain an injunction to prevent Youngstown from dewatering the bed of Rabbit Lake. The title to the lakebed was not involved; therefore, the right to possession and control of the funds, but not of their ownership, was involved. The

right to *possession* of the royalty funds under the lease and the determination of *title* thereto are substantially different matters. State v. Adams, *supra,* is res judicata against the state on the question of title.

The commissioner also contends that Youngstown is barred by laches running from the date of the stipulation for judgment in State v. Zontelli, October 15, 1943, to the present. Since it is obvious that Youngstown's right to the royalties, as now asserted by it, could not have arisen until it was finally determined by regular proceedings in a judicial action that title was or was not in the state, Youngstown's claim could not have arisen before the entry of final judgment in State v. Adams, *supra.* The record shows that on June 13, 1958, judgment was entered in the district court in that case, following the appeal to this court wherein the order for judgment by the lower court was affirmed. Thereafter, the state sought review by petition for writ of certiorari to the United States Supreme Court, which was denied October 13, 1958. On February 20, 1959, Youngstown submitted its verified claim for refundment of royalties paid under the June 4, 1924, lease as amended in State v. Zontelli.

Thus Youngstown's right to claim refund of royalties paid arose by virtue of the entry of final judgment in the Adams case. Youngstown filed its verified claim pursuant to Minn. St. 6.136 within 8½ months after entry of said judgment. The commissioner's contention that the filing came late and that Youngstown is guilty of laches is without support in the record. While the commissioner also contends that State v. Zontelli settled the issue of title to the bed of Rabbit Lake in favor of the state, the stipulation, findings, and judgment therein clearly contradict that claim by recognizing that a final determination of title was not made.

The commissioner's final contention in regard to the judgment in State v. Zontelli is that Youngstown is nevertheless estopped by accord and satisfaction.

In Hennessy v. St. Paul City Ry. Co. 65 Minn. 13, 15, 67 N. W. 635, it was stated:

"* * * Accord and satisfaction is the discharge of a contract, or

cause of action, or disputed claim, arising either in contract or tort, by the substitution of an agreement between the parties in satisfaction of such contract, cause of action, or disputed claim, and the execution of that agreement. Like any other agreement, there must be an assent to, and a meeting of the minds of both parties upon, the terms of the new agreement."

In order for an accord and satisfaction to exist, there must be an honest dispute between the parties, a tender with the explicit understanding of both parties that it was in full payment of all demands, and an acceptance by the creditor with the understanding that the tender is accepted in full payment. Apex Motor Fuel Co. v. Stigletz, 348 Ill. App. 123, 108 N. E. (2d) 29. In State v. Zontelli the amount of money payable by the terms of the lease was not in dispute, nor was the amount in the escrow accounts. While Youngstown agreed and stipulated that the transfer could be effected, it carefully preserved its rights by declaring that should it subsequently be determined that title to the property was in someone other than the State of Minnesota, the covenant requiring payment of royalties to the state would fail for lack of consideration.

. The commissioner apparently contends that, since the funds are now in the state's possession, the stipulation under which it obtained possession constitutes an accord and satisfaction. In Cut Price Super Markets v. Kingpin Foods, Inc. 256 Minn. 339, 356, 98 N. W. (2d) 257, 269, in holding that a regular monthly franchise payment of the amount due in full did not constitute an accord and satisfaction as to other items in dispute, we stated:

"* * * The rule has always been clear that the mere retention by the creditor of money to which he is entitled absolutely will not amount to an accord and satisfaction although tendered or transmitted to him as payment in full of demand. In an accord and satisfaction, it is the mutual agreement of the parties to the terms of the compromise and not the dispute which furnishes the consideration for the release."

The statements which appear in both the findings and the judgment of

the Zontelli case are decisive against the contention that an accord and satisfaction was ever contemplated in that action.

The findings in that case—entered pursuant to the stipulation of the parties—also establish that they entered the lease of June 4, 1924, with intent to comply with all applicable laws and that the consideration for the covenants to pay royalties was based on the premise that the state was the owner of the ore in the bed of Rabbit Lake. These findings provide:

"That said lease and the whole thereof was entered into in good faith by each of the contracting parties with intent to comply with all applicable laws and that the provisions of Section XI (2) aforesaid were inserted without any intention on the part of any of the contracting parties to avoid payment of the royalties required to be paid by the statutes authorizing the lease, if the state were the owner and authorized to dispose of the ore in the bed of the lake; that said lease without the inclusion of Section XI (2) is a full and complete agreement and none of the provisions thereof are contingent or dependent upon the matters contained in said Section XI (2).

"*That the entire consideration for the covenants to pay royalties and rentals* stipulated in Sections IV and VI of the lease referred to in Finding number IV, *was based upon the premise that the State was the owner of the ore in the bed of the lake.*" (Italics supplied.)

In February 1944 the state instituted an action against Youngstown and several other parties, Crow Wing County District Court File No. 23151, hereinafter referred to as No. 23151. The purpose of that action was to quiet title to, and determine boundary lines in, a portion of the bed of Rabbit Lake. On November 27, 1950, some 6 years later, this action, on Youngstown's motion, was consolidated for trial with State v. Adams and five other actions brought by the state to determine adverse claims to the bed of Rabbit Lake and to the beds of other lakes in the Rabbit Lake chain.

At the outset of the trial it was conceded by the parties that the only issue to be determined in all the actions except No. 23151 was whether or not the waters of the Rabbit Lake chain were navigable. A dispute arose as to whether this was true with respect to No. 23151.

In subsequent discussion, as shown by the record in State v. Adams, *supra,* the state claimed that No. 23151 involved a boundary dispute and that if the issue was limited to navigability, proof could not be offered on the boundary question. Opposing counsel countered that the pleadings did not raise a boundary question. The court then offered the following compromise:

"* * * Well, I think both counsel have overlooked one quite important feature; The boundaries are asked to be determined by both the defendants and the state in the one case but not in the others. It seems to me that I would be satisfied with the finding in the other cases that the state was or was not the owner of that land bounded by the low water mark. * * *

"These cases are consolidated for trial but they are still individual cases and will have to have individual findings in them, so I am willing to rule that the boundary question, aside from the general description of the low water mark as creating a boundary, is not in the other cases but is in the Youngstown Mines case."

Apparently as a result of the foregoing, no findings were made by the court in No. 23151, although findings adverse to the state were entered in the six remaining cases. The commissioner now argues that No. 23151 is still pending since it was not disposed of in the Adams case. He also claims that the Adams case is res judicata only as to the issue of navigability. He now asserts the pending action is not limited to the issue of state ownership by navigability but involves other important questions relating to the constitutionality of L. 1909, c. 49; title by adverse possession; title by dedication; title by estoppel; and whether the state may have effected a severance of the mineral estate from the estate in the land itself.

In spite of the foregoing assertions by the commissioner regarding the nature and effect of State v. Adams, *supra,* we cannot escape the import of the judgment therein which states:

"* * * IT IS ADJUDGED, DETERMINED AND DECREED that plaintiff, State of Minnesota, has no right, title, estate, or interest in the bed of Rabbit Lake * * *."

While it might be conceded that the Adams case was tried on the theory of navigability, it cannot be denied that the actions consolidated for trial were brought to quiet title, i. e., to settle adverse claims, and that the judgments therefore fully and finally quieted title to the property involved, including the bed of Rabbit Lake. We conclude, as the record demands, that such was the effect of that case.

The commissioner's claim that title might be determined by other theories does not stand the test this court announced in Veline v. Dahlquist, 64 Minn. 119, 121, 66 N. W. 141, 142:

"A judgment on the merits constitutes an absolute bar to a second suit for the same cause of action, and is conclusive between parties and privies, not only as to every matter which was actually litigated, but also as to every matter which might have been litigated therein. Bazille v. Murray, 40 Minn. 48, 41 N. W. 238; Swank v. St. Paul C. R. Co., 61 Minn. 423, 63 N. W. 1088."

Therefore, a second suit or successive suits on the issue of title to the property are barred by the first.

As stated, the record in State v. Adams, *supra,* reveals that No. 23151 involved a boundary dispute and an action to quiet title. The six other actions were brought to quiet title and did not relate to any dispute as to boundaries. Both an action to quiet title and an action to determine boundary lines are statutory. Minn. St. c. 559. While it is not necessary to determine boundary lines in an action to quiet title, it is necessary to quiet title in an action to determine boundary lines. Hodson v. Hammer, 229 Minn. 389, 39 N. W. (2d) 601.

Since the brunt of the evidence in State v. Adams, *supra,* went to the question of title to the chain of lakes rather than a particular portion of the bed of Rabbit Lake, the parties and the court in effect stipulated for a reservation of judgment in No. 23151 while leaving it consolidated for trial. The simple and apparent conclusion which we must reach here is that once the court decided that the state did not have title to any portion of the bed of Rabbit Lake, the state was not in a position to litigate an action to determine a boundary dispute concerning such property. Thus, the result is that No. 23151 simply became moot. It would be preposterous to assert that an ac-

tion against Youngstown concerning the boundary line of a portion of Rabbit Lake could, regardless of the stipulation for reservation of judgment in No. 23151, result in a determination that the state had title to any portion of the lake. Were the state to rely on No. 23151 to assert claims of title against any of the riparian owners made parties thereto, it is obvious that the Adams case would be a bar res judicata.

■ After entry of judgment in the Adams case, on June 13, 1958, Youngstown stopped all royalty payments. The commissioner, however, has contended that the ownership of the iron ore in the leased premises was declared by the legislature to be in the state and is, therefore, unaffected by the decision in State v. Adams, *supra*. We surmise that this contention stems from L. 1909, c. 49, whereby the legislature declared that the state was the owner of all minerals under "meandered public lakes." In Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 54 N. W. (2d) 912, we held that the fact that ponds were not meandered by the United States survey does not establish that the waterway was not in fact navigable at the time of the survey. We pointed out there that surveying officers have no power to settle questions of navigability, citing Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. ed. 771. We also approved the rule laid down in Harrison v. Fite (8 Cir.) 148 F. 781, 784, where the court said:

"The action of the government surveyors in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability at the time; but it is not conclusive. The surveyors are invested with no power to foreclose inquiry into the true character of the water."

In State v. Adams, 251 Minn. 521, 560, 89 N. W. (2d) 661, 687, this court said:

"* * * Meandered lakes are not necessarily navigable lakes. Meandering a lake does not determine the question of its navigability. Meander lines by government surveyors are mainly for the purpose of determining the quantity of land which is to be paid for by a prospective purchaser. The government surveyors had no power to determine navigability."

The commissioner in argument before the district court referred to the statutory and case law prior to the enactment of L. 1909, c. 49, directing attention to Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 A. L. R. 670, which to some extent was incorporated in L. 1897, c. 257.

Beginning with the Lamprey case the courts of this state apparently assumed that title to beds of water was to be decided according to state law and they accordingly adopted what has been referred to as the "public waters" test as a definition of navigability. The Lamprey case divided waters into "public and private," equating the term "public" with the word "navigable," and stated that so long as waters were capable of any beneficial public use, they were public waters. The result of that decision was to make title to the beds of bodies of water dependent upon the state definition of "public waters." This court indicated in the Lamprey case that where a public interest was manifested in waters for recreational purposes, such waters should be considered public or navigable waters, a theory which prevailed for many years. See, State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139.

In 1909 the legislature, by L. 1909, c. 49, § 1, declared that "all iron ores and other minerals on, in or under lands within this state, which lie beneath the waters of *meandered public lakes and rivers,* belong to the state." (Italics supplied.) In none of the cases cited by the state was the constitutionality of this provision considered. It was amended by L. 1947, c. 521, by substitution of the word "navigable" for the words "meandered public."

The Lamprey decision and those following it were thought to represent the correct view until the decision in United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465. That case, which involved the navigability of a lake in this state, was decided in 1926. The Holt case stated the law to be as follows (270 U. S. 55, 46 S. Ct. 199, 70 L. ed. 469):

"Both courts below found that the lake was navigable. But they treated the question of navigability as one of local law to be determined by applying the rule adopted in Minnesota. We think they applied a

wrong standard. Navigability, when asserted as the basis of a right arising under the Constitution of the United States, is necessarily a question of federal law to be determined according to the general rule recognized and applied in the federal courts."

Following the Holt case the question came before this court in State v. Longyear Holding Co. 224 Minn. 451, 458, 29 N. W. (2d) 657, 662, where this court said:

"It is well settled that the test of navigability to fix ownership of lake beds must be determined as of the date of a state's admission to the Union and under the federal decisions with reference thereto."

This case was followed by Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 342, 54 N. W. (2d) 912, 918, wherein this court said:

"Whether a body of water is navigable for the purpose of determining title is a federal question, and the federal, not the state, tests of navigability must be applied."

The latest case prior to the Adams case was State, by Burnquist, v. Bollenbach, 241 Minn. 103, 116, 63 N. W. (2d) 278, 287, in which we again said:

"Navigability for purposes of determining title to water beds is a federal question controlled by the federal test of navigability."

An examination of the Holt case and other Federal cases shows that under the Federal test a body of water to be navigable must be navigable in fact; that is, in its natural and ordinary condition it must constitute, or be susceptible of constituting, a highway of commerce for trade and travel.[1]

---

[1]See, United States v. Rio Grande D. & I. Co. 174 U. S. 690, 19 S. Ct. 770, 43 L. ed. 1136; Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. ed. 771; Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 67 L. ed. 140; United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465; United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. ed. 844; United States v. Oregon, 295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267.

The issue of navigability in State v. Adams, *supra,* was expressly raised by the pleadings therein. The vital fact of title was litigated and determined. It is elementary that a judgment in an action is final and conclusive between the same parties as to all questions or issues presented by the pleadings. White v. Hewitt, 119 Minn. 340, 138 N. W. 421. We apply that rule here.

■ The commissioner has proceeded on the theory that Youngstown assumed a continuing obligation under the lease to pay royalties, at least until entry of judgment in State v. Adams, *supra.* An examination of a table of payments to fee owners attached to and made a part of Youngstown's supplemental brief, in answer to an inquiry from this court on oral argument, reveals that between June 4, 1924, and the date of entry of judgment in the Adams case Youngstown paid more to the fee owners than it paid to the state. The brief indicates that three riparian tracts are involved—the Crosby lease, the Adams lease, and the Kennedy mine. The following table indicates the total amount paid to the riparian owners and the state up to 1958:

| | |
|---|---|
| Minimum royalties paid to owners of Kennedy mine | $160,819.26 |
| Loan to owners (8/26/26) | 50,000.00 |
| Net interest | 10,000.00 |
| Loans to same owners ($5,000, 9/25/35; $10,000 annually thereafter) | 225,000.00 |
| Unamortized interest | 125,161.47 |
| Royalties paid owners under Adams lease | 377.57 |
| Minimum royalties to owners under Crosby lease | 50,000.00 |
| Total payments to private owners | $621,358.30 |
| Total payments to state up to time of Adams decision | $559,789.55 |

Minn. St. 6.136 reads as follows:

"Subdivision 1. Money paid into the state treasury through error or under circumstances such that the state is not legally entitled to re-

tain it, may be refunded upon the submission of a verified claim therefor. The claimant shall present his verified claim, together with a complete statement of facts and reasons for which the refund is claimed, to the head of the state agency concerned, who shall forthwith examine it, attach thereto his approval or disapproval thereof together with his reasons therefor, and submit the claim to the state auditor for settlement in the manner provided by law.

"Subd. 2. There is hereby appropriated to the persons entitled to such refund, from the fund in the state treasury to which the money was credited, an amount sufficient to make the refund and payment."

The commissioner argues that the court below erred in refusing to dismiss the petition for certiorari or quash the writ on the ground it lacked jurisdiction to review the acts of an administrative official in refusing to approve a claim made pursuant to § 6.136. He contends that his action was an act of legislative discretion, done pursuant to a limited delegation of the exclusive legislative prerogative of entertaining claims against the state, and as such is not subject to judicial review. He asserts that such review would be violative of Minn. Const. art. 3, § 1, which provides how the powers of government shall be divided. He also cites art. 4, § 12, which provides in part:

"No money shall be appropriated except by bill,"

and art. 9, § 9, which provides:

"No money shall ever be paid out of the treasury of this State except in pursuance of an appropriation by law."

He makes the further claim that if his acts may be reviewed by certiorari the filing of a claim under § 6.136 is in effect a suit against the state in its sovereign capacity.

It is, of course, an elementary principle of jurisprudence that a sovereign state cannot be sued by individuals in its own courts or in any court without its consent. Dunn v. Schmid, 239 Minn. 559, 60 N. W. (2d) 14, cited by the commissioner, recognizes this rule. However, the Dunn case was a suit brought directly against the Department of Education and Schmid as director of vocational education, and we there held that an action against an official department of the

state is, in effect, a suit against the state and not maintainable without its consent. Certiorari, however, is an entirely different proceeding as shown by Johnson v. City of Minneapolis, 209 Minn. 67, 71, 295 N. W. 406, 408, where this court said:

"Plaintiff stoutly maintains that certiorari is an 'action' because the proceeding 'was commenced by the issuance' of the writ 'by the district court.' In this he is clearly in error. Rather, as we have seen, it is in its very nature and purpose an appeal—a review—to correct error."

It appears from the record that the commissioner at the hearing below contended that where a party voluntarily pays money under a contract it may not later be recovered even though paid under a mistake of law, and also that money paid to a state or any of its subdivisions in response to an illegal demand may not be recovered absent a specific legislative authorization directing such refund. He also contended that to justify recovery of money paid under a mistake of fact the mistake must relate to a fact which is material and essential to the transaction between the parties. Another contention made is that at the time the lease was executed and Youngstown agreed to pay the royalties demanded, it could have sought an adjudication of the state's right to demand payment. In other words, the claim made was that Youngstown had the opportunity to discover or determine the basis of the state's claim of ownership at the time it entered into the lease. He also contended, upon the basis of equitable estoppel, that the royalty payments were not paid through error or under such circumstances that the state is not legally entitled to retain them, suggesting that Youngstown must have been aware of the provision of L. 1909, c. 49, when the lease was executed.

He also argued that where a statute defines conditions under which state property may be disposed of, the inclusion of unauthorized conditions is void and does not estop the state in subsequent proceedings from asserting their invalidity. Essentially, this argument attacked the power of the court to determine in the judgment in State v. Zontelli that "in the event it is finally determined by any final judicial determination that the state is not the owner of the ore in the bed of

Rabbit Lake, the covenant to pay the royalties and rentals stipulated in * * * said lease, shall fail for lack of consideration therefor." However, at this time any attack thus directed against the effect of the judgment entered in that case is demonstrably futile. The commissioner has entirely failed to recognize that when a state acts under its prerogative of sovereignty the doctrine of estoppel has no application, but that when a state makes itself a party to an action or to a contract in its proprietary capacity, it is subject to the law of estoppel. Similarly, while acting in its sovereign character the state is immune, but when it descends to the level of those with whom it associates and interests itself in any property and proprietary rights as distinguished from governmental prerogatives, it subjects itself to the same liability as any other litigant. See, State ex rel. Smiley v. Holm, 186 Minn. 331, 243 N. W. 133; State v. Horr, 165 Minn. 1, 205 N. W. 444.

Thus, we think the circumstances make it clear that where the state, acting in its proprietary capacity, made a lease with Youngstown as lessee in 1924; sued for a reformation of the lease in 1943; stipulated for judgment in the reformation proceedings; permitted judgment to be entered therein in 1944, and for all the years following continued in its proprietary capacity under the lease as reformed, it committed itself in that capacity to the obligations contained in the original lease and the lease as amended, and also became bound by the judgments entered in the Petraborg, Zontelli, and Adams cases, in the same capacity.

The whole argument for the state with respect to State v. Zontelli is reducible to the claim that the judgment was erroneous, and no more, which by no means appears. There is no question but that the district court at the time had jurisdiction of both subject matter and parties and applied the stipulation entered into by the parties. It would be too late to make that claim now even if what the state claims were true in whole or in part. See, LaRue Iron Min. Co. v. Village of Nashwauk, 176 Minn. 117, 222 N. W. 527; 10 Dunnell, Dig. (3 ed.) §§ 5143 to 5146.

■ Clearly the state in entering into the lease with Youngstown acted not in its sovereign, but in its proprietary, capacity, subjecting

itself to the same liability as other litigants. Under this lease the state's right to receive royalties was conditioned upon its ownership of the lakebed. In the subsequent action for reformation of the lease the parties stipulated that this right should remain conditional upon the state's ownership. It was finally and absolutely determined that the condition did not exist by the decision and entry of judgment in State v. Adams, *supra*. As stated above, in that case the question of the navigability of Rabbit Lake at the time of the state's admission to the Union was fully litigated and it was finally determined, contrary to the claim of the state, that the lake was not then navigable under the Federal tests of navigability. The decision finally established that fee title to the lakebed is held by the riparian owners.

The commissioner contends that the royalties received under the lease constitute rents and profits of land and that such lease does not constitute a sale of ore in place, citing Minnesota Loan & Trust Co. v. Douglas, 135 Minn. 413, 161 N. W. 158, and several other Minnesota cases. He also contends that a lessee is liable for rents even where the dispute as to title was known to it before it entered into the lease, citing Allen v. Chatfield, 8 Minn. 386 (435); Morrison v. Bassett, 26 Minn. 235, 2 N. W. 851; Harwood v. Meloney, 139 Minn. 212, 166 N. W. 125, L. R. A. 1918C, 118, and several cases from other jurisdictions. An examination of these cases clearly demonstrates that they have little application here and are neither controlling nor persuasive.

This court has held that a lessee is not estopped to deny his lessor's title where the title has terminated. Tilleny v. Knoblauch, 73 Minn. 108, 75 N. W. 1039. Certainly the same rule must apply where the lessor never had title. Since the lease provided that the state's right to retain the royalties paid was to depend upon its ownership of the land mined, the lease conferred no rights except those derivable from ownership. That ownership has been denied and there is clearly a failure of consideration justifying recovery for prior performance, which in the instant case was payment of royalties based upon the assumption of both parties to the lease that the state owned the bed of Rabbit Lake and the ore therein which Youngstown mined. It is

the simple fact that the parties expressly conditioned the obligation to pay royalties upon title in the lessor. American Law of Property, § 3.65, states:

"The parties to the lease may always stipulate that the lessee is not bound thereon unless the lessor's title is valid."

The judgment in State v. Zontelli stated in simple terms that upon a final judicial determination that the state is not the owner, the covenant to pay royalties shall fail for lack of consideration. The court below stated in its memorandum decision that it was of the opinion that, inasmuch as the royalty payments were knowingly made by Youngstown pursuant to the lease and the judgment in State v. Zontelli, they were not paid through error. The court went on to say:

"* * * If the first condition, that of money paid through error, implies a payment made as the result of a factual mistake, then the payments were not made through error. The Court is of the opinion that the payments were made under circumstances that the State is not legally entitled to retain them. Reduced to simplicity, the payments were made to the State for iron ore which the State did not own. In good conscience and in equity no one has the right to retain payment for something he does not own, and the statute [Minn. St. 6.136] seems to embody this legal and moral principle."

In view of the terms of the lease, Youngstown's right to recover the payments it has made thereunder is clearly established by our decisions. The state received Youngstown's money. It became enriched by that amount without parting with any consideration therefor. The terms of the lease, both originally and after amendment, clearly show that any royalties paid should be retained by the state only if it was the owner of such iron ore. Under the circumstances it is only fair to conclude that these royalty payments should in equity and good conscience be restored to Youngstown. The applicable law was stated by Mr. Justice Mitchell in the early decision of Brand v. Williams, 29 Minn. 238, 239, 13 N. W. 42, as follows:

"An action for money had and received can be maintained whenever one man has received or obtained the possession of the money of

another, which he ought in equity and good conscience to pay over. This proposition is elementary. There need be no privity between the parties, or any promise to pay, other than that which results or is implied from one man's having another's money, which he has no right conscientiously to retain. In such case the equitable principle upon which the action is founded implies the contract and the promise. When the fact is proved that he has the money, if he cannot show a legal or equitable ground for retaining it, the law creates the privity and the promise."

Other Minnesota cases following the Brand case are Turner v. Valley Nat. Farm Loan Assn. 182 Minn. 115, 233 N. W. 856; Seastrand v. D. A. Foley & Co. 144 Minn. 239, 175 N. W. 117; Grand Lodge A.O.U.W. v. Towne, 136 Minn. 72, 161 N. W. 403, L. R. A. 1917E, 344; and Todd v. Bettingen, 109 Minn. 493, 124 N. W. 443. See, also, West Texas State Bank v. Tri-Service Drilling Co. (Tex. Civ. App.) 339 S. W. (2d) 249, 253, wherein the court held that "a payment made with a reservation of the right to bring suit for its recovery is not a voluntary payment."

In J. W. Carter Music Co. v. Bass (S. D. Tex.) 20 F. (2d) 390, 394, a suit at law was brought in accordance with statutes of the United States allowing such suit, and the principles of the common law controlling the same, against a collector of internal revenue to recover sums collected by him as taxes in excess of amounts actually due. The court said:

"The principle of law governing this form of action is: 'Where money has peen paid under a mistake as to a material fact, to one not entitled thereto, and who cannot in good conscience receive and retain it, the law raises an implied promise on his part to refund it, and an action will lie to recover it back.' Elgin v. Gross-Kelly, 20 N. M. 450, 150 P. 922, L. R. A. 1916A, 711."

In Lobit v. Marcoulides (Tex. Civ. App.) 225 S. W. 757, 762, the court said:

"We think the question of appellees' right to recover the money which, under the finding of the jury, appellants were not entitled to

demand of them is relieved of all doubt by the express terms of the release and receipt executed by appellants when the money was paid by appellees. The release receipt recites that the sum paid by appellees to obtain the release of the judgment was paid under protest; 'they claiming no sum due thereon, and without prejudice to their right, if any, to bring suit therefor.' Having obtained the money from appellees under this express agreement, appellants cannot claim that the payment was a voluntary one, and that appellees cannot recover the money which, under finding of the jury, they did not owe appellants, and it would be manifestly unjust to allow appellants to retain it. 21 Ruling Case Law, p. 143; U. S. v. Edmonston, 181 U. S. 500, 21 Sup. Ct. 718, 45 L. Ed. 978."

In Picotte v. Mills, 200 Mo. App. 127, 203 S. W. 825, the court held:

"Ownership of land is a mixed question of law and fact, or rather a fact based on and resulting from the law, and sufficient to uphold an allegation of mistake of fact in an action for money paid under mistake for title to land owned by plaintiff.

"Money received under a mutual mistake of fact * * * can be recovered in an action at law for money had and received.

"When one person sells land or a definite interest therein to another, and each party acts under the assumption and mistaken belief that the vendor has the interest and title he bargains to sell and for which he receives the money, but such is not the fact, then the money has been paid under a mutual mistake of fact and may be recovered.

"Where money is paid under mistake that is mutual, negligence of the party paying it does not bar his recovery thereof."

In McKibben v. Doyle, 173 Pa. 579, 34 A. 455, the plaintiff paid for a party wall which defendant claimed to own. It was afterwards discovered that the defendant was not the owner of it. Plaintiff sought recovery of the money she had paid on the ground that it was paid under a mutual mistake of fact. The Pennsylvania court in affirming a directed verdict for plaintiff said (173 Pa. 581, 34 A. 455):

"* * * Recognizing their duty to pay the owner of the wall, and

relying upon her assertion of ownership, they paid her. It was a pure mistake of fact. The defendant sold what she did not own. There is nothing to take the case out of the rule that money erroneously paid under a mutual mistake of fact may be recovered back. The mere omission to take advantage of means of knowledge within the reach of the party paying does not prevent a recovery. [Citations omitted.]"

See, also, Betta v. Smith, 368 Pa. 33, 81 A. (2d) 538. There a lessee who had relied on the lessor's representations that he owned the right to remove coal from adjoining lands was held entitled to recover royalties paid on coal mined from such lands, notwithstanding the lessor's contention that the royalty payments had been made under mistake of law and were thus not recoverable.[2]

■ In his brief the commissioner asserts that the royalty payments were impressed with a trust by L. 1917, c. 110, § 2. Section 2 provided that the funds obtained through the disposal of iron ore under waters of "public" lakes or rivers should be added to the permanent school fund and preserved "inviolate."

This statute was expressly repealed by L. 1943, c. 208. That act continued the provision for payment into the school fund of revenues from permits or leases of iron ore under "public" lakes or rivers, and also provided that the repeal should not be construed as repudiating valid provisions of existing leases, but contained no provision making funds received from such sources inviolate. Thus, it must be clear that if the funds had been impressed with an express trust by the act of 1917, that trust was revoked by the act of 1943.

The commissioner's brief merely says that the royalties were impressed with the trust. We can only assume that under the circumstances his point is in fact directed to the contention that the appropriation provision, Minn. St. 6.136, subd. 2, is not specific enough to reach the fund to which the royalties in this case had been credited, i. e., the permanent school fund.

In considering this contention we cannot lose sight of the unique character of this particular statute. It does not provide for the adju-

---

[2]See, Restatement in the Courts, 1954 Supp., Restitution, c. 2, § 7.

dication of rights dependent upon controverted questions of law and fact. It is limited to two situations: Money paid into the state treasury through error or paid under circumstances such that the state is not legally entitled to retain it. We think it clear that the purpose of the legislature was to provide a simple and expeditious mode of recovery for persons whose money may thus be held in the state treasury by authorizing them to file a verified claim with the state agency concerned.

It would have been both impracticable as well as unnecessary for the legislature to anticipate every condition and every circumstance under which moneys have been paid to a particular fund. Section 6.136 did no more than make the fund which held the royalty payments subject to the terms of the lease of June 4, 1924, and to the order and judgment in State v. Zontelli and State v. Adams, *supra*. There is no merit in the argument on behalf of the state that L. 1909, c. 49, was declaratory of the common law in Minnesota and vested title to the bed of Rabbit Lake in the state; that Youngstown is estopped to deny the state's title; and that Minn. St. 6.136 therefore does not apply to Youngstown's claim.

The provisions of § 6.136 make it clear that the legislature specifically appropriated "from the fund in the state treasury to which the money was credited" an amount sufficient to pay Youngstown's claim. The mere crediting of the royalties to the school trust fund did not impress them with a trust. Cf. Westerson v. State, 207 Minn. 412, 291 N. W. 900. The only moneys in the permanent school trust fund protected by Minn. Const. art. 8, § 2, from legislative appropriation are "the proceeds of such lands as are or hereafter may be granted by the United States for the use of schools." What other moneys may be directed to be paid into the school trust fund by the legislature or by state officials have no constitutional protection from appropriation by the legislature and occupy the same status as any other fund belonging to the state and not specifically restricted by the constitution.

As Youngstown points out, the mere fact that after the reformation of the lease the royalties were credited to the school fund does not

480

make them inviolate. This is illustrated by Minn. St. 93.356, which provides for the payment of proceeds of mining leases under § 93.20 into the permanent school fund, and § 93.20, subd. 9(2), which provides that in case of dispute, after following the procedures therein described, amounts found due a lessee above the amount adjustable against subsequent royalties shall be refunded pursuant to § 6.136.

It should be noted that the lease contains numerous affirmations that it applies only to the mining of "iron ore owned by the State of Minnesota."[3] No such language has been employed in the general statutory form of state mining lease set forth in § 93.20. Clearly the royalties paid to the state under both the original and the amended lease were paid on condition that the state had title.

L. 1917, c. 110, is not authority for the leasing of lands the state did not own nor for retention of payments under such a lease. There is nothing in the record which would support such an absurd construction and we are not justified in ascribing such intent to the lawmaking body. The Adams case established that the riparian owners had

---

[3]The lease provided that its various provisions applied with respect only to "iron ore owned by the State of Minnesota" in six of the articles of said lease, as follows:

Art. I.   Purpose of lease: Mining "iron ore owned by the State of Minnesota."

Art. IV.   Lessee agrees to "pay * * * for all iron ore belonging to said state and mined, removed, and shipped from said land."

Art. V.   Transmission from lessee to state auditor of statement of amount of "such iron ore owned by the State of Minnesota as shall have been shipped" during period for which payment is made.

Art. V.   Lessee to pay taxes on leased land and "the iron ore thereon owned by the State of Minnesota."

Art. VI.   Minimum royalty, whether ore was mined or not, equal to the royalty on ore "mined, removed and shipped from said land of the iron ore therein owned by the State of Minnesota [of] at least ten thousand (10,000) tons annually."

Art. X.   Lessor reserves "a lien upon all ore belonging to the State of Minnesota * * * for any unpaid balance due on this contract."

Art. XIV.   Cross-mining rights through adjoining premises to remove "any ore belonging to the State of Minnesota mined upon said [leased] land "

title to the underwater ore lands. Before that determination was made the riparian owners compelled Youngstown to make agreements with them assuring them of royalties for ore taken from the lakebed should they prevail in their claim of title. There was no law prohibiting the parties to the lease herein from contracting to make the obligation to pay royalties conditional on title in the lessor. It is clear that the lease provided, in advance of determination of title, what the parties' rights should be when that question was settled. Certainly, where a lessee knows there are two claimants to the title, he has both a legal and moral right to protect himself by contract against liability to both.

The test of the right to certiorari, so far as parties are concerned, is whether the person seeking the writ was a party in form or in substance so as to be concluded by the determination of the matters in controversy. State ex rel. Wickstrom v. Board of County Commrs. 98 Minn. 89, 107 N. W. 730. In State ex rel. Ross v. Posz, 106 Minn. 197, 118 N. W. 1014, this court held that a landowner was entitled to a certiorari to review an order of the board of county commissioners to construct a ditch with branches, one of which would affect his property.

The commissioner contends, however, that the district court was without jurisdiction to proceed by certiorari. Minn. St. 484.03 provides that the district courts of this state shall have power to issue writs of certiorari and direct as to their service and return. Whether the writ should be granted rests in the first instance in the discretion of the court.

The nature and function of the writ are discussed in 3 Dunnell, Dig. (3 ed.) §§ 1391 to 1400, and in 3 Davis, Administrative Law Treatise, § 24.02. The nature of certiorari jurisdiction has been carefully analyzed in Riesenfeld, *Judicial Control of Administrative Action by Means of the Extraordinary Remedies in Minnesota,* 33 Minn. L. Rev. 685. The power to issue the writ and the proceedings thereon remain unaffected by the Rules of Civil Procedure. See, Rule 81.01(1) and Appendix A.

In Johnson v. City of Minneapolis, 209 Minn. 67, 69, 295 N. W.

406, 407, this court commented on the nature and effect of certiorari, saying:

"Certiorari as used in this state is not the common-law writ, 'but rather a writ in the nature of certiorari.' Hence, it has been held * * * that 'certiorari is employed strictly as in the nature of a writ of error or an appeal.' Its 'legitimate office * * * is to review and correct decisions and final determinations of inferior tribunals.' When a return is made to the writ 'the inquiry is whether or not there has been error, and, upon answer to this question, the court above determines whether to affirm or reverse, just as is done in cases of writs of error or of appeals. * * * It is a writ of review of acts which are judicial or quasi judicial in their nature. * * * Its office is not to restrain or prohibit, but to annul. It is not original process.' "

This court in State ex rel. Sisters of Order of St. Benedict v. Willrich, 72 Minn. 165, 75 N. W. 123, held that the district courts of this state have jurisdiction to issue writs of certiorari to probate courts, to review their judgments and decrees which are not appealable. We have also held certiorari the proper remedy to review the decision of the governor in removing a county attorney in State ex rel. Kinsella v. Eberhart, 116 Minn. 313, 133 N. W. 357, 39 L. R. A. (N. S.) 43; and to review the action of the commissioner of agriculture in disallowing a claim in Festler v. Wallach, 245 Minn. 222, 71 N. W. (2d) 836. In State ex rel. Huntley School Dist. v. Schweickhard, 232 Minn. 342, 45 N. W. (2d) 657, an appeal was taken from an order quashing writs of certiorari which had been sought in the district court to review the action of a statutory appeal board in fixing boundaries of high school districts in Faribault County. This court held that the action of the board was legislative and affirmed the order quashing the writs, saying (232 Minn. 344, 45 N. W. [2d] 658):

"This court has confined the scope of the writ of certiorari to the review of the proceedings either judicial or quasi-judicial in character. It is not available to review legislative or purely ministerial acts of administrative agencies or officers."

In State ex rel. Bd. of County Commrs. v. Dunn, 86 Minn. 301,

90 N. W. 772, certiorari was issued to review a decision made by the state auditor that certain personal property owned by relators was properly listed for taxation and taxable in Carlton County. We said in that case that to render the proceedings of administrative officials or tribunals judicial in their nature they must affect the legal or property rights of the citizens in a manner analogous to the procedure of courts acting judicially, and said (86 Minn. 304, 90 N. W. 773):

"* * * The exercise of judicial functions may involve the performance of legislative or administrative duties, and the performance of administrative or ministerial duties may, in a measure, involve the exercise of judicial functions. It may be said generally that the exercise of judicial functions is to determine what the law is, and what the legal rights of parties are, with respect to a matter in controversy; and whenever an officer is clothed with that authority, and undertakes to determine those questions, he acts judicially. [Citations omitted.]"

In effect we held that the state auditor had acted in a judicial capacity and that his decision affected not only a substantial, but a legal, right of the property owner. We also held in that case that if no other remedy was available, certiorari would lie to review the decision of the auditor.

In State ex rel. Barber Asphalt Paving Co. v. District Court, 90 Minn. 457, 97 N. W. 132, this court said, citing State ex rel. Bd. of County Commrs. v. Dunn, *supra,* that the administrative officers of a city or county act quasi-judicially in passing upon claims. However, the cited case was distinguished in State ex rel. Nat. Bond & Security Co. v. Dunn, 88 Minn. 444, 93 N. W. 306, where this court reviewed on certiorari a decision of the state auditor denying a petition under G. S. 1894, § 1697, for refundment of certain taxes. This statute provided that when a board of county commissioners should certify to the state auditor that they were satisfied that the facts were fully and fairly stated in a petition for refund of the amount paid for a tax certificate claimed to be invalid, the auditor was required, if satisfied after conference with the attorney general that the facts stated in

the petition rendered the certificate invalid within the principle of any decision of this court, to authorize refundment of the amount paid for the certificate and any subsequent taxes paid on the land. We there said (88 Minn. 447, 93 N. W. 307):

"* * * The only question before us is whether any prior decision of the court, as to either of the objections [to the tax certificate], is squarely in point to the effect that they are fatal; for that was all the state auditor was required or can be permitted to pass upon, within the purview of the statute."

It is contended by Youngstown that that is exactly what the commissioner was required to do in the instant case—to determine whether the judgment entered in State v. Adams, *supra,* had decided the question of title.

In Minnesota Sugar Co. v. Iverson, 91 Minn. 30, 34, 97 N. W. 454, 455, which involved a statute which directed the state auditor to determine the validity of a claim, this court said:

"* * * If the Auditor, by acting in conformity with the statute, has the power of adjudication upon the rights of persons and property, his acts must be quasi judicial at least."

Thus, it is clear that the writ, being in the nature of an appeal, is designed to bring up for review the final determination of an inferior tribunal which, if unreversed, would constitute a final adjudication of some legal rights of the relator. Ordinarily certiorari will not lie where there has been an opportunity for appeal and it does not apply to mere legislative or ministerial acts. Its office is to review proceedings which are judicial or quasi-judicial in their nature and have affected the citizen in his rights of person or property. It is clear that the commissioner in this case, acting pursuant to Minn. St. 6.136, had the power of adjudication upon the rights of persons and property and, as Youngstown contends, that he was required to determine whether the judgment entered in State v. Adams, *supra,* had decided the question of title. He thus acted in at least a quasi-judicial capacity.

The commissioner argues that his action with respect to a claim submitted to him pursuant to § 6.136 is an act of legislative discretion,

performed under a limited delegation of an exclusively legislative function, and is therefore not subject to judicial review by certiorari. The cases discussed above which approved use of the writ where the legislature has granted power to an official or agency to adjudicate upon the rights of persons and property, but has provided no appeal from the exercise of such power, answer that contention. There are numerous cases also which sustain the legislative commitment of the allowance or disallowance of claims to a board or commissioner, a common example being the class of cases relating to acts which affect the rights of persons and property, though they do not determine the right to refundment of money other than back pay. Illustrations of this type are the determination of the status of public employees under civil service, tenure rights, and veterans' preference acts.

It is clear from examination of §§ 484.03 and 606.01 to 606.05 that the legislature has created no exception with respect to the application of certiorari to a state agency or its head. Such agencies and their heads are accordingly bound by these provisions when the state acts in a proprietary capacity, as it did in the instant case.

In State v. Tennyson, 212 Minn. 158, 161, 2 N. W. (2d) 833, 835, 139 A. L. R. 987, this court said:

"* * * It is for the legislature and not the court to create exceptions, if there are to be any. Where the statute is couched in broad and comprehensive language admitting of no exceptions, the court is not justified in engrafting thereon exceptions, however much it may deem the public welfare to require them."

Since the proceedings involved herein are authorized by statute and comply with Minnesota practice, and since the state is acting in its proprietary capacity, they do not constitute an action or proceeding against the state without its permission. While it is recognized as an elementary principle in the law that a sovereign state cannot be sued by individuals in its own courts or in any court without its consent, it remains clear that the entry of a formal judgment of affirmance or reversal is neither contemplated nor authorized in a certiorari proceeding. The office of the writ is simply to review and correct decisions and determinations already made. Upon return of the writ, the in-

quiry is whether or not there has been error and upon answer to this question the court determines whether to affirm or reverse just as is done in cases of writs of error or of appeals. Grinager v. Town of Norway, 33 Minn. 127, 22 N. W. 174. See, also, State ex rel. Ging v. Board of Education, 213 Minn. 550, 7 N. W. (2d) 544.

■■ The commissioner contends that the district court erred in refusing to dismiss Youngstown's petition, quash the writ, or grant summary judgment on the ground that the claim does not come within the terms of § 6.136. Youngstown contends that upon the verified claim being filed, the commissioner's duty was:

"* * * 1) to read the lease as modified by the judgment in *Zontelli,* reforming certain provisions; 2) to read the judgment in the *Adams* case, which 'adjudged, determined and decreed that the plaintiff State of Minnesota, has no right, title, estate or interest in the bed of Rabbit Lake * * *' (adding governmental descriptions covered by the judgment); 3) to determine whether the lands described in the judgment in the *Adams* case included the land on which the rent, measured by royalty per ton of ore, had been paid into the state treasury by the claimant."

Section 6.136, subd. 1, requires that the commissioner examine the verified claim, attach thereto his approval or disapproval with his reasons therefor, and submit the same to the state auditor for settlement. No appeal from his determination is provided. Subd. 2 clearly appropriates "to the persons entitled to such refund, from the fund in the state treasury to which the money was credited, an amount sufficient to make the refund and payment."

The commissioner contends that § 6.136 contemplates only the payment of such moneys as were paid through obvious error under circumstances which can leave no doubt in responsible minds that the state is not legally entitled to retain them. He further contends that if § 6.136 is construed as authorizing a state official to approve the payment of disputed claims against the state, it would be an unconstitutional delegation of legislative authority. He argues that Youngstown's exclusive remedy for recovery of royalties paid pursuant to the

Rabbit Lake lease is to present a claim to the Legislative Claims Commission or directly to the legislature.

Minn. St. 3.66 to 3.84 provides for the Legislative Claims Commission. Minn. St. 3.73, enumerating the claims which may be considered by the commission, provides in part:

"In accordance with sections 3.66 to 3.84, the commission shall consider claims which, but for some statutory restrictions, inhibitions, or limitations, could be maintained in the courts of the state. No liability is imposed upon the state or any of its agencies by a determination of the commission approving a claim and recommending an award unless the legislature has previously made an appropriation for the payment of such claim subject to the determination of the commission, or unless the amount of the commission's award is less than $2,500 and the legislature has previously made an appropriation for the payment of such claims during the biennium."

Section 3.74 provides the jurisdictional requisites. These are in part as follows:

"(1) Claims and demands against the state or any of its agencies, which the state in its sovereign capacity should in equity and good conscience discharge and pay."

A reading of § 3.74 indicates that the type of claims dealt with in the Legislative Claims Commission Act are claims which call for adjudication of liability and the amount of the compensation payable on what may be disputed facts.

We note that § 3.74 further provides in part:

"Except for the claims excluded by section 3.75, the jurisdiction of the commission shall extend to the following matters:

\* \* \* \* \*

"(3) The status of any claim referred to the commission by the head of a state agency for an advisory determination."

The commissioner did not refer the claim to the commission, although he now claims that Youngstown should have presented a claim to it rather than seek judicial review of his action by certiorari.

We agree with the conclusion of the trial court that Youngstown was entitled to certiorari, and with the reasoning set forth in its memorandum:

"* * * [I]t appears: (1) that no appeal is allowed from the disapproval of the latter's claims; (2) that the action of disapproval was judicial or quasi-judicial; (3) the disapproval affected relator in his property rights; and (4) the disapproval was the final adjudication of a claimed legal right of the relator. It follows that certiorari was the proper method of procedure in this matter."

After reading the Legislative Claims Commission Act and § 6.136, it appears clear that § 6.136 was enacted, not for the purpose of weighing the equities and deciding whether the state ought in equity and in good conscience be considered liable, but to provide the machinery for passing upon verified claims for refundment of money in its hands, but which had been paid into the state treasury through error or under such circumstances that the state is not legally entitled to retain it.

While Youngstown does not question the Minnesota rule that an iron ore lease is in fact a lease, and not a sale of ore in place, as held in State v. Evans, 99 Minn. 220, 108 N. W. 958, it insists that the lease before us is a special type of lease, the sole, stated purpose of which from the time of its execution was the production of iron ore. The nature of such a lease has been illustrated in Diamond Iron Min. Co. v. Buckeye Iron Min. Co. 70 Minn. 500, 73 N. W. 507. In the latter case the lease was for the mining and removal of iron ore and required the lessee to pay minimum royalties annually, with the right to offset such amounts against the tonnage actually taken in subsequent years. Upon exploring for ore the lessee found there was no merchantable ore in the land. This court held, in an opinion written by Mr. Justice Mitchell, that merchantable shipping ore was the subject of the lease, and since there was no such ore in the leased lands the lessor was not entitled to the sum stipulated as minimum royalties. If this court reached that conclusion in the Diamond Iron Mining Company case, it would seem in equity and justice that the state in the instant case is not entitled to retain the royalty payments

when it had heretofore stipulated that its right to them was dependent upon its title to the bed of Rabbit Lake and such title has been finally determined by a court of competent jurisdiction to be in the riparian owners and not in the state.

Assuming that the words "through error" in § 6.136 were intended to provide for recovery of payments made to the state through factual mistake, it must be conceded that the royalty payments were made knowingly, pursuant to a lease and a judgment and in conformity with them. We agree with the court below, however, that Youngstown was entitled to recover the payments on the ground they had been made under circumstances such that the state is not legally entitled to retain them.

The commissioner contends that the phrase in § 6.136, "through error or under circumstances such that the state is not legally entitled to retain it," must be read as a whole and that the word "or" is used in the conjunctive, and not in the disjunctive, making the words "under circumstances such that the state is not legally entitled to retain it" explanatory of the words "through error." We have no difficulty in concluding that the statute plainly reads in the disjunctive, giving the administrative official jurisdiction to act in a quasi-judicial capacity by considering verified claims submitted to recover moneys paid (1) through error or factual mistake, *or* (2) under such circumstances that the state is not legally entitled to retain them.[4]

---

[4] The record contains an opinion of the attorney general (No. 454-E, February 1, 1944) respecting receipts from the Rabbit Lake iron ore lease. Addressed to the state treasurer and written by the attorney general who held office when the litigation in Petraborg v. Zontelli, 217 Minn. 536, 15 N. W. (2d) 174, and State v. Zontelli, Crow Wing County District Court File No. 19547, was initiated and concluded to judgment, and when the litigation culminating in the entry of judgment in the Adams case was instituted, the opinion said in part:

"* * * Likewise, the accepting by the state treasurer in his official capacity of payments as required of the lessee under [L. 1917, c. 110] and the reformed lease here in question and also as now stipulated by the lessee and ordered by the court, and the crediting of the same as hereinabove stated in accordance with both statutory provisions and the order of the court, would not in the event the court should ultimately hold the state

Since the certiorari proceedings were brought to review the action of the commissioner of conservation, we hold that the state auditor was not a proper party to these proceedings and as to him the writ of certiorari was properly quashed. We also hold that in view of the provisions of the original lease and of that lease as amended, the judgment entered pursuant to stipulation of the parties in State v. Zontelli, and the final adjudication in State v. Adams, *supra,* determining that the state does not have title to the bed of Rabbit Lake, Youngstown is entitled to refundment of the royalties paid under the lease.

The determination of the court below is hereby affirmed and the within matter remanded for further proceedings in accordance with the decision herein.

Affirmed.

MR. JUSTICE SHERAN, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

has no title to the Rabbit Lake ore, make the state treasurer personally or otherwise liable for moneys so accepted. If the state shall eventually be found by the courts to have no title to the ore, the return of the money paid into the state treasury by the lessee will be a matter solely beween the state and the lessee and for determination by the courts or the state legislature.

\* \* \* \* \*

"The purpose of this provision which you question [a provision in the judgment in State v. Zontelli for continuance of the permits under which Youngstown was authorized to construct dams and drain the lake] is for the protection of the lessee. It should not be obliged to incur the enormous expense necessary for the mining of the ore leased to it by the state and, if it is found later by the court that the state does not own the ore, be restrained in its operations in excavating the same. Whether the state owns the ore or not, it will be receiving considerable benefit from the mining thereof in the form of occupation and other taxes, the creation of employment for its citizens and the furnishing during the war of a material much needed in its prosecution. In addition the public's interest in the waters of the lake is protected by a provision requiring the lessee to restore, within one year after the termination of its operations, the lake to its former or natural condition as nearly as practicable by the opening of a channel or channels as in the permit provided."