In the Matter of the Petition of MINNE-APOLIS COMMUNITY DEVELOP-MENT AGENCY in Relation to Certificate of Title No. 471580 issued for land in the County of Hennepin and State of Minnesota and legally described as follows: Par 2: That part of Lot 2 lying East of the West 10 feet thereof, Block 109, Township Minneapolis; Par 3: The west Half of Lot 3, Block 201, Town of Minneapolis; Par 5: The West 10 feet and the East 28.5 feet of Lot 3, Block 200, Town of Minneapolis; Par 6: Lot 4, Block 200, Town of Minneapolis.

No. C6–84–903.

Court of Appeals of Minnesota.

Dec. 24, 1984.

John M. LeFevre, Jr., Holmes & Graven, Chtd., Minneapolis, for respondent Minneapolis Community Development Agency.

Gregory T. Spalj, Jerome S. Rice Law Firm, Minneapolis, for appellant Cedar-Riverside Land Co.

Heard, considered and decided by RANDALL, P.J., HUSPENI, and FORSBERG, JJ.

## OPINION

RANDALL, Judge.

The Minneapolis Community Development Agency ("MCDA") petitioned to be registered as the owner of property located in the Cedar-Riverside area of Minneapolis. The Cedar-Riverside Land Co. ("CRLC") alleged that the deed by which MCDA acquired the property from CRLC was invalid. After a court trial, the court found that MCDA had validly exercised its option to purchase the land, the deed was therefore valid, and MCDA should be registered as the owner of the property. CRLC appealed, and we affirm.

## FACTS

CRLC owns approximately 75% of the residential, non-public property in the Cedar-Riverside neighborhood of Minneapolis. It intended to create a "new town in town" with the aid of the Department of Housing and Urban Development.

A series of lawsuits among neighborhood groups, HUD, the city, the city housing authority, and the First National Bank of St. Paul brought development to a standstill. In 1980 an action brought by Cedar-Riverside Associates, against the federal government to prevent foreclosure of certain indentures, and against the city and the Minneapolis Housing and Redevelopment Authority (MCDA's predecessor) for allegedly helping to stop development, was settled by the execution of agreements giving MCDA options to purchase certain Cedar-Riverside properties. The options were contingent upon MCDA certifying that there was a "funded developer" which was ready to develop the property, which had received the necessary zoning and other government approvals, and which had secured financing for the development.

This settlement comprised two agreements. The first agreement was between the bank and CRLC; the second, between the bank and MCDA. The bank's role was solely that of an intermediary; it is not a party to this action. In order to exercise its option, MCDA had to certify that it had a qualified funded developer. The bank would then purchase the property from CRLC and sell it to MCDA. If CRLC refused to convey, the bank could deliver a deed on CRLC's behalf under a power of attorney provision.

Before June 17, 1982, MCDA received a proposal to develop the property from West Bank Homes, a limited partnership comprising two area contractors. (As CRLC points out, the actual documents for forming the limited partnership were not filed until after MCDA exercised its option.) West Bank had financing commitments from HUD (a Section 8 subsidy, the commitment for which expired August 1, 1982), as well as from the city and from private financers. West Bank had also taken steps to obtain necessary government approvals, including a zoning variance, a conditional use permit, and rezoning approval. MCDA then certified (on June 17) that it had a funded developer, and directed exercise of the option. The bank sent the required notice and representations to CRLC, which refused to deliver a deed. The bank then delivered the alternate deed under the power of attorney and it is that deed which CRLC is challenging here.

After MCDA obtained the deed, it entered into a long-term lease with West Bank Homes, which completed the first phase of its development. People are now living in dwellings erected by West Bank Homes on the property which is here in dispute.

## ISSUES

1. Are CRLC's objections to title moot?

2. Is CRLC barred from raising its objections to title by the determination of prior litigation?

3. Did MCDA properly exercise its option?

## ANALYSIS

### I.

*Mootness*

■ MCDA contends that this appeal is moot as there is no actual controversy between the parties. It argues that since the options do not expire until 1988 and it is clear that West Bank Homes *now* meets the criteria required of a "funded developer" (since the project has, in fact, been completed), CRLC would be required to execute a deed if MCDA today demanded one. This is an appealing argument. Significantly, however, the parcel of land which is here at issue is not the only parcel covered by the agreement. Other parcels covered by the same contracts await development, and it is on account of those parcels that CRLC seeks a ruling on whether MCDA's exercise of its option on this parcel was effective. Since resolution of this question will have an effect and requires no speculation upon hypothetical facts, it is not moot. *See Cass County v. U.S.*, 570 F.2d 737 (8th Cir.1978) (basis for mootness doctrine is that courts should not decide cases which will have no effect or which require speculation upon hypothetical facts).

### II.

*Res judicata*

MCDA contends that CRLC is precluded from attacking its title by virtue of the dismissal of a previous action in which CRLC *could have* raised its objections to title but did not. Because objections to title were, in MCDA's view, claims which arose from the same cause of action as the other claims raised in that litigation, MCDA argues that the dismissal of that litigation settled the issue of title to the property and CRLC is estopped from relitigating it.

■ It is true that a judgment on the merits is conclusive as to every matter which was or which should have been litigated in the prior action. *Scott-Peabody & Associates v. Northern Leasing Corp.*, 273 Minn. 236, 140 N.W.2d 614 (1966); *Youngstown Mines Corp. v. Prout*, 266 Minn. 450, 466, 124 N.W.2d 328, 340 (1963). The reason for the res judicata doctrine is not only to discourage collateral attacks on judgments but also to discourage claim-splitting. *See Dollar Travel Agency, Inc. v. Northwest Airlines, Inc.*, 354 N.W.2d 880 (Minn.Ct.App.1984). Had the previous action been fully litigated and determined on the merits, the judgment might have been conclusive as to title. Such was not the case, however.

■ The action which MCDA claims is conclusive here was begun by CRLC on June 28, 1982. It sought injunctive relief to stop the West Bank Homes project. The action was dismissed with prejudice on July 7, 1982, but was not determined on the merits. Since it was not determined on the merits, only those issues *actually determined* by the dismissal are conclusive in a subsequent action. *Sachs v. Jenista*, 296 Minn. 535, 210 N.W.2d 45 (1973); *Hentschel v. Smith*, 278 Minn. 86, 153 N.W.2d 199 (1967). Since CRLC did not raise the issue of the improper or invalid conveyance in the prior action, that issue was not determined by the dismissal.

### III.

*The merits*

CRLC contends that it had no obligation to convey the property, and the deed from its attorney-in-fact under the power of attorney is therefore invalid, because West Bank Homes did not qualify as a "funded developer" under the agreements. MCDA contends that even if West Bank Homes did not, in fact, meet every requirement for a funded developer, MCDA's good faith certification was sufficient to validly exercise its option.

The contract, which was part of the settlement of an earlier case, states, in relevant part:

A "Funded Developer" is a person who is desirous of acquiring the real estate for the purpose of developing such property by either constructing thereon new structures and/or substantially rehabilitating existing structures, and who, subject to the acquisition of the property, *has obtained a certificate from the Bank or the MCDA certifying that:*

(i) The person is ready, willing and able to commence development, and

(ii) (a) Has secured all required municipal, state, and federal permits and approvals in order to commence said development activities, including, without limitation, the approval of all plans and specifications required by all governmental authorities in order to secure promptly the building permits required to commence construction, rehabilitation, or other development activities; and

(b) Has received the bona fide commitment from a governmental agency or financial institution to provide construction and permanent financing for the development activity and its subsequent operation; and

(c) Has received bona fide commitments to provide necessary equity financing for the development; and

(d) Can reasonably and fairly represent that said development activity will commence within 30 days of the date that the person acquires any real property subject to this agreement.

(Emphasis added). According to the agreement, then, the only requirements the developer must meet to qualify as a "funded developer" are (1) it must be desirous of acquiring the real estate for the purpose of developing it, and (2) it must have obtained a certificate from the Bank or the MCDA certifying certain things. West Bank Homes met both requirements.

CRLC argues, however, that the certificate given West Bank Homes by MCDA was invalid because West Bank Homes had not secured all required governmental permits and received bona fide commitments for financing. MCDA counters that even if CRLC is correct in asserting that West Bank Homes did not, strictly speaking, qualify for the certificate, West Bank's actual receipt of the certificate was sufficient, absent bad faith by MCDA in delivering it. We agree. The agreement defined a "funded developer" as one who had obtained the certificate. West Bank Homes had obtained the certificate, and the bank, as intermediary, was satisfied that West Bank Homes qualified. Therefore, CRLC was required to convey the land to MCDA. When it refused, the bank was authorized to execute a deed under the power of attorney provision. In other words, whether or not West Bank Homes had secured permits and financing is irrelevant in determining whether CRLC had an obligation to convey. The only relevant inquiry CRLC was permitted to make was "does West Bank Homes have the certificate?"

Had CRLC desired to retain more control over who received certification as a "funded developer," it should have argued for insertion of such control in the contract. A provision for CRLC to approve the developer, with some neutral third party having arbitration power, could easily have been drafted into the contract. However, it was not. All the contract required of a "funded developer" was that it be a developer desirous of developing the land and that it obtain a certificate from MCDA.

■ *Even if* CRLC was entitled to look at the statements underlying the certification of West Bank Homes as a "funded developer" before conveying the property to MCDA, the record shows that West Bank Homes had, at least preliminarily, secured the necessary permits and funding commitments. Final documents had not, in most cases, been signed, but that is because West Bank Homes did not yet have any interest in the property. To argue that formal loan agreements had to be executed before a certificate giving West Bank Homes the status of a "funded developer" could be issued is to ignore the realities of the marketplace. Few, if any, lenders will lend money to build on a piece of property to which the borrower does not have title

or even a leasehold interest. When MCDA issued the certificate, HUD had reserved funds for a Section 8 subsidy, the Minneapolis city council had approved a housing development revenue bond program, a private financier had provided a commitment for construction financing, MCDA had itself committed equity loans to the project, and all necessary governmental permits had been preliminarily secured, contingent upon West Bank Homes getting the leasehold. MCDA thus had valid reasons to issue the certificate which made West Bank Homes a "funded developer."

Further, the reasons behind the requirement that the developer be certified were satisfied here. The timely completion of the project is persuasive evidence of West Bank Homes' qualifications. CRLC did not want MCDA to acquire the property only to let it sit idle while developers scrambled to put together a development package. The provisions of the agreement were an attempt to ensure that the development would be completed in a reasonable amount of time. It was. Construction started within a few months of the conveyance to MCDA, and is now substantially complete.

DECISION

CRLC's appeal is not moot, nor is it barred by res judicata.

■ The only condition precedent to MCDA's exercise of its option to purchase the subject land was its certification of a "funded developer." Since there was no indication of bad faith on MCDA's part, that condition was met.

Affirmed.