BROWN–WILBERT, INC., et al., Appellants (A05–340), Respondents (A05–1952),

v.

COPELAND BUHL & CO., P.L.L.P., et al., Respondents (A05–340), Appellants (A05–1952).

Nos. A05–340, A05–1952.

Supreme Court of Minnesota.

May 31, 2007.

Kay Nord Hunt, Lommen, Nelson, Cole & Stageberg, P.A.; George E. Antrim, III, George E. Antrim, III, PLLC, Minneapolis, MN, for Appellants (A05–340), Respondents (A05–1952).

Peter A. Koller, Thomas J. Shroyer, Moss & Barnett, P.A., Minneapolis, MN, for Respondents (A05–340), Appellants (A05–1952).

## O P I N I O N

HANSON, Justice.

These appeals arise out of two civil actions brought by Chris Brown and Brown–Wilbert, Inc. (collectively Brown–Wilbert), against Copeland Buhl & Company and Lee Harren (collectively Accountants). The first complaint was served in March 2004 and contained four counts: (1) breach of contract, (2) breach of fiduciary duty, (3) accounting malpractice, and (4) restitution (*BW–I*). The district court granted Accountants' motion to dismiss all counts of *BW–I* under Minn.Stat. § 544.42 (2006), on the grounds that Brown–Wilbert failed to timely serve an affidavit of expert review or an affidavit of expert disclosure. The court of appeals affirmed the dismissal of the accounting malpractice count, holding that Brown–Wilbert failed to timely serve an affidavit of expert review, but reversed the district court's dismissal of the three remaining counts and remanded them for an analysis of whether they are subject to the affidavit requirements of section 544.42. *Brown–Wilbert, Inc., v. Copeland Buhl & Co.*, No. A05–340, 2005 WL 3111959, at *3–4 (Minn.App. Nov. 22, 2005), *rev. granted* (Minn. Feb. 14, 2006). We affirm the dismissal of the accounting malpractice count, but on different grounds.

While Brown–Wilbert's appeal in *BW–I* was pending in the court of appeals,

Brown–Wilbert served a second complaint against Accountants alleging the same facts but adding four new counts: (1) fraud, (2) intentional misrepresentation, (3) negligent misrepresentation, and (4) aiding and abetting (*BW–II*). The district court dismissed *BW–II* on res judicata grounds. The court of appeals reversed, holding that the judgment in *BW–I* was not final because the appellate process had not been exhausted. *Brown–Wilbert, Inc. v. Copeland Buhl & Co.*, 715 N.W.2d 484, 488 (Minn.App.2006), *rev. granted* (Minn. Aug. 23, 2006). We affirm the reinstatement of the complaint in *BW–II*, but on different grounds.

Brown–Wilbert is a Minnesota burial vault manufacturing company. The company obtained its name in 1995, when Christopher Brown (Chris) and his father Jerry Brown (Jerry) incorporated Brown, Inc., purchased Chandler–Wilbert, Inc., and merged the two companies into Brown–Wilbert, Inc. This litigation arises out of these 1995 transactions.

Brown–Wilbert alleges that Accountants served as Jerry's personal accountant, as accountants for Brown, Inc., and later Brown–Wilbert, Inc. Brown–Wilbert alleges that Accountants: (1) advocated on Jerry's behalf and failed to advise Chris of the conflicts of interest between Chris and Jerry; (2) proposed that Chris should own 80% of the equity in Brown, Inc., but Jerry should have 51% of the voting shares; and (3) misrepresented that Chandler–Wilbert, Inc., had insisted on this ownership and control arrangement as a condition for the loan it gave to Brown, Inc., to help finance the purchase. Brown–Wilbert also alleges that Accountants: (1) attempted to squeeze Chris out of Brown–Wilbert, Inc., by pressuring Chris to sell his majority interest to Jerry; (2) were not independent; and (3) acted contrary to Chris's interests.

Chris filed a shareholder's action against Jerry, which resulted in Chris buying all of Jerry's shares in Brown–Wilbert. Brown–Wilbert then commenced *BW–I* against Accountants. In connection with that action, Brown–Wilbert was required to serve, with the pleadings, an affidavit of expert review, certifying that counsel had reviewed the facts of the case with an expert who reached the opinion that Accountants had deviated from the applicable standard of care, causing injury to Brown–Wilbert. Minn.Stat. § 544.42, subds. 2(1), 3(1) (2006). In addition, Brown–Wilbert was required to serve, within 180 days after service of the complaint, an affidavit of expert disclosure, signed by counsel, naming the experts that counsel expected to call at trial and providing "the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn.Stat. § 544.42, subds. 2(2), 4 (2006).

The failure to serve an affidavit of expert review "within 60 days after demand for the affidavit results, upon motion, in mandatory dismissal of each cause of action with prejudice as to which expert testimony is necessary to establish a prima facie case." Minn.Stat. § 544.42, subd. 6(a) (2006). And the failure to serve an affidavit of expert disclosure also

> results, upon motion, in mandatory dismissal of each action with prejudice as to which expert testimony is necessary, to establish a prima facie case, provided that an initial motion to dismiss an action * * * based upon claimed deficiencies of the affidavit or answers to interrogatories shall not be granted unless, after notice by the court, the nonmoving party is given 60 days to satisfy the disclosure requirements in subdivision 4.

Section 544.42, subdivision 6(c).

Brown–Wilbert did not include an affidavit of expert review when it served its

complaint in *BW–I*. Accountants did not make a separate demand for an affidavit of expert review but, on or about May 18, 2004, Accountants served expert interrogatories on Brown–Wilbert. On June 18, 2004, Brown–Wilbert filed answers to those interrogatories, stating that it expected to call two expert witnesses, Rob Tautges and William R. Legier. In response to an interrogatory asking for the subject matter, the substance of the facts and opinions and the grounds for each opinion to which these witnesses were expected to testify, the answers stated:

> Both experts have been recently retained. Mr. Tautges' firm, Tautges Redpath, Ltd., serves as the current Certified Public Accountant for Brown–Wilbert, Inc. Both experts are expected to testify as to the conclusions set forth in the Complaint, based upon the facts alleged in the Complaint. Plaintiffs will supplement this Answer as necessary. Discovery is continuing.

On September 21, 2004, more than 180 days after the commencement of *BW–I*, Accountants moved to dismiss all four counts of the complaint, arguing that Brown–Wilbert's answers to the interrogatories did not satisfy the requirements of either of the necessary expert affidavits. On October 15, 2004, Brown–Wilbert filed a response to that motion that included an affidavit of counsel purporting to contain both an affidavit of expert review and an affidavit of expert disclosure.

The district court granted Accountants' motion and dismissed all four counts of the complaint in *BW–I* with prejudice. As to the affidavit of expert review, the court concluded that Accountants' service of the expert interrogatories constituted a "demand" under subdivision 6(a) and that Brown–Wilbert's October 15, 2004, affidavit of counsel was served more than 60 days after the demand and was untimely.

As to the affidavit of expert disclosure, the court concluded that Brown–Wilbert's "[a]nswers to [i]nterrogatories fail to identify the experts, state their opinions, and state the basis of these opinions as required by statute, and therefore fail to resemble the second affidavit." As a result, the court held that Brown–Wilbert did not serve an affidavit of expert disclosure within 180 days after commencement of the action.

The court of appeals agreed with the district court's conclusion that the interrogatories served by Accountants were a sufficient "demand" for an affidavit of expert review and that the affidavit of October 15, 2004, was untimely because it was served more than 60 days after that demand. *BW–I*, 2005 WL 3111959, at *2–3. The court of appeals did not address the requirements for a valid affidavit of expert disclosure.

While *BW–I* was pending before the court of appeals, Brown–Wilbert served on Accountants the complaint in *BW–II*. Accountants moved the district court to dismiss *BW–II*, arguing that the judgment of dismissal in *BW–I* had res judicata effects and barred the second action. The district court concluded that *BW–II* was precluded by res judicata because the judgment in *BW–I* was final, even though the appeal was pending, and it was on the merits because it dismissed all counts, not just the accounting malpractice count. The court of appeals reversed the dismissal of *BW–II*, holding that the judgment in *BW–I* was not final until the appellate process was exhausted. *BW–II*, 715 N.W.2d at 488. The court of appeals also rejected Accountants' alternative argument that *BW–II* should be dismissed on grounds of claim splitting, holding that claim splitting is not an independent defense but is simply "inextricably linked to res judicata." *Id.* at 489.

## I.

■ In *BW–I*, the only issue before us is the appropriateness of the dismissal with prejudice of the accounting malpractice count. Accountants did not seek review of the court of appeals' reversal of the judgment as to the counts for breach of contract, breach of fiduciary duty, or restitution. We review a district court's dismissal of an action for procedural irregularities under an abuse of discretion standard. *See Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 426 (Minn.2002) (reviewing a district court's dismissal of a claim pursuant to Minn.Stat. § 145.682 (2006)). But where a question of law is present, such as statutory construction, we apply a de novo review. *Id.*

### A. *Affidavit of Expert Review*

■ The district court and the court of appeals each concluded that Accountants' interrogatories constituted a demand that triggered the running of the 60–day period for providing an affidavit of expert review. Although interrogatories could serve as such a demand if they provide adequate notice that an affidavit of expert review is required, we conclude that Accountants' interrogatories did not constitute such a demand. Accountants' interrogatories did not refer to section 544.42, or use the words "expert review." Moreover, the interrogatories did not request the specific type of information that is to be included in an affidavit of expert review.

Because Accountants' interrogatories did not constitute a demand, the 60–day period did not begin to run until Accountants moved to dismiss. And because Brown–Wilbert filed an affidavit of expert review on October 15, 2004, within 60 days after service of Accountants' motion to dismiss, the affidavit of expert review was timely.[1]

### B. *Affidavit of Expert Disclosure*

Section 544.42, subdivision 2(2), requires that an affidavit of expert disclosure be served within 180 days after commencement of the action. The October 15, 2004, affidavit was filed more than 180 days from the commencement of the action and, therefore, it does not satisfy the 180–day requirement. But Brown–Wilbert argues that it filed answers to interrogatories within the 180–day period and that, although those answers contained some deficiencies, they were sufficient to meet the minimum standard for an affidavit of expert disclosure.[2] Brown–Wilbert further argues that any deficiencies in the answers to interrogatories were cured by the October 15 affidavit. More specifically, Brown–Wilbert argues that its answers to the interrogatories were sufficient to meet the minimum standards for an affidavit of expert disclosure, as specified in section 544.42, subdivision 4; that the answers therefore satisfied the 180–day requirement contained in subdivision 2(2); and that any deficiencies in the answers could be cured after notice as provided by subdivision 6. To address Brown–Wilbert's argument, therefore, we must determine what the minimum standards are for an affidavit of expert disclosure to satisfy the

---

1. Accountants also suggest that Brown–Wilbert's expert affidavit plainly indicates that the expert review had not occurred until after the action was commenced. Because we affirm the dismissal of the accounting malpractice count on other grounds, we need not address that argument.

2. Section 544.42, subdivision 4(a), specifically provides that answers to interrogatories that state the information required for an affidavit of expert disclosure satisfy the requirements of such an affidavit "if they are signed by the party's attorney and served upon the opponent within 180 days after commencement of the action against the defendant."

180–day requirement and entitle the plaintiff to notice of any deficiencies and 60 days to satisfy the disclosure requirement.

■ Section 544.42, subdivision 4 describes the requirements for an affidavit of expert disclosure—it must (1) be signed by plaintiff's counsel and (2) state the identity of each expert, the substance of the facts and opinions of each expert, and a summary of the grounds for each opinion. Brown–Wilbert's answers to the interrogatories are deficient because, although they are (1) signed by counsel [3] and (2) state the identity of the experts, they fail to state the substance of the facts and opinions of each expert or the grounds for each opinion. The question becomes whether the answers are so deficient that they do not meet the standards for an affidavit of expert disclosure, sufficient to minimally satisfy the 180–day requirement.

Accountants argue that answers to interrogatories cannot satisfy the 180–day requirement unless they represent a "good faith attempt" to comply with the requirements for an affidavit of expert disclosure. Accountants argue that Brown–Wilbert's answers did not represent a good faith attempt to comply because they did not provide specific information for two of the statutory disclosure requirements—the substance of the facts relied on and opinions reached by each expert and a summary of the grounds for each opinion.

The federal district court, construing section 544.42, subdivision 6, in an action brought under that court's diversity jurisdiction, stated that dismissal was not required where an affidavit was "*submitted in good faith*," even though the affidavit was not "sufficiently specific or procedurally perfect." *House v. Kelbel,* 105

F.Supp.2d 1045, 1048, 1053 (D.Minn.2000) (emphasis added). But *House* is unpersuasive because the plaintiff in *House* did not file *any* affidavit within 180 days of commencing suit. *Id.* at 1048. Thus, the reference to "good faith attempt" in *House* was dicta—the dismissal was based on the failure to file any affidavit, not on a determination that an affidavit was filed but was not filed in good faith. *Id.* at 1054. The court said:

> To construe § 544.42, subd. 6(c) to allow for 60 extra days for the plaintiff to provide the affidavit at all would be an absurd result. It would allow the plaintiff to disregard the requirement, and if the defendant failed to move for dismissal, the case would proceed without the plaintiff having met the requirement. If the defendant did file the motion, the court would have to provide a hearing and issue a specific finding that the plaintiff did not provide the affidavit. Then the plaintiff would receive an extra 60 days to do so. This construction of the statute could allow for an excessive amount of time to pass without the plaintiff establishing that the case has merit * * *.

*Id.*

■ We decline to adopt a "good faith" standard because it would inject a subjective element into the requirements for an affidavit of expert disclosure. We find nothing in section 544.42 to suggest that subjective elements should be considered. Instead, we read section 544.42, subdivision 4, to describe objective requirements for an affidavit of expert disclosure that can be measured on the face of any document that is claimed to be such an affidavit, without inquiry into counsel's intent.

---

**3.** We note that the signature of counsel on the answers to the interrogatories is restricted by the words "as to objections," but Accountants do not challenge the sufficiency of the signature.

Both parties discuss cases decided under the analogous statute, Minn.Stat. § 145.682 (2006), involving the affidavit requirements for medical malpractice actions. In that context we have said that an affidavit of expert disclosure requires

> far more information than simply identification of the expert intended to be called at trial or a "general disclosure" * * *, and non-affidavit materials, absence of prejudice to defendant, failure of defendant to prove plaintiff's claim is frivolous or failure of defendant to alert plaintiff to the inadequacy of the affidavit of expert identification will not excuse or justify an affidavit of expert identification falling short of the substantive disclosure requirement.

*Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 578 (Minn.1999) (dismissing medical malpractice action); *see also Teffeteller*, 645 N.W.2d at 430 (dismissing medical malpractice action and stating that the affidavit required under section 145.682, subdivision 4, must give more than a "sneak preview" of the expert's testimony); *Stroud v. Hennepin County Med. Ctr.*, 556 N.W.2d 552, 555–56 (Minn.1996) (dismissing medical malpractice action and stating that section 145.682 requires that the affidavit contain specific details concerning the expert's expected testimony); *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 193 (Minn.1990) (stating that the affidavit or answers to interrogatories must include "specific details concerning their experts' expected testimony, including the applicable standard of care, the acts or omissions that plaintiffs allege violated the standard of care and an outline of the chain of causation that allegedly resulted in damage" to plaintiffs). But there are differences between sections 544.42 and 145.682 that limit the usefulness of that analogy.

As originally enacted in 1986, and as considered in *Lindberg, Stroud,* and *Sorenson,* section 145.682 did not have any cure provision. Act of Mar. 25, 1986, ch. 455, § 60, 1986 Minn. Laws 840, 871–72. When section 544.42 was enacted in 1997, it included the cure provisions of subdivision 6, ostensibly for the purpose of avoiding the harsh results that had been reached in *Lindberg* and *Stroud.* Although section 145.862 was amended in 2001 to insert a cure provision for medical malpractice claims, making section 145.862 more similar to section 544.42, Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws 1706, 1706–07, the amendment to section 145.682 was based on the perception that meritorious medical malpractice claims were being dismissed where the expert disclosure affidavit was only missing some technical information that could be corrected. Sen. debate on S.F. 0936, 82nd Minn. Leg., May 16, 2001 (audio tape) (statement of Sen. Neuville, author of the bill).

■ Accountants' arguments correctly emphasize that sections 145.682 and 544.42 have a common legislative purpose to provide for the early dismissal of frivolous malpractice claims. Brown–Wilbert's arguments correctly emphasize that the cure provisions enacted with section 544.42, and later added to section 145.682, reflect another legislative purpose—to avoid the dismissal of meritorious claims over minor technicalities. These arguments focus the issue. It is undoubtedly true that an affidavit may be sufficient to satisfy the 180–day requirement even though it contains minor deficiencies. The existence of the cure provisions in subdivision 6 requires that interpretation. But it is also undoubtedly true that an affidavit is not sufficient to satisfy the 180–day requirement if the deficiencies are so great that it provides no significant information. Any other interpretation would render the 180–day re-

quirement meaningless. The difficulty is to determine where to draw the precise line between these two extremes.

■ Reading the statute as a whole suggests that the affidavit of expert disclosure requires greater information than an affidavit of expert review. The affidavit of expert review is supposed to be served with the complaint and requires the attorney to certify that the attorney has consulted with an expert with adequate qualifications and that the expert has reached the opinion that the defendant deviated from the applicable standard of care in a way that caused the plaintiff's injuries. Section 544.42, subdivision 3(a)(1). An affidavit of expert disclosure, which is not required until 180 days after commencement of the action, must, by comparison and by definition, provide more information than an affidavit of expert review. Section 544.42, subdivisions 3(a)(1), 4(a).

■ Further, if we look to the purpose for section 544.42, to provide a mechanism for the early dismissal of frivolous actions, the minimum standards for such an affidavit should be that it contains meaningful information on each of the issues for which expert testimony will be required at trial to avoid a directed verdict. Although we have not specifically

determined what level of expert testimony a plaintiff must provide in order to survive a motion for a directed verdict in an accountant malpractice case, we have done so in the medical and legal malpractice context.[4] We have said that a plaintiff must demonstrate "(1) the standard of care recognized by the medical community * * *, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from that standard was a direct cause of [the plaintiff's] injuries" to establish a prima facie case and create a jury question in a medical malpractice case. *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 5 (Minn. 1982); *cf. Admiral Merchs. Motor Freight v. O'Connor & Hannan*, 494 N.W.2d 261, 266 (Minn.1992) (stating that expert testimony is generally required to establish the standard of care applicable to legal malpractice, whether the attorney deviated from that standard, and whether that deviation caused the plaintiff's injury). Thus, in order to survive a motion for directed verdict in an accountant malpractice case, a plaintiff must present expert testimony that identifies the applicable standard of care and opines that the accountant deviated from that standard and that the departure caused the plaintiff's damages.[5]

---

4. Accountants are held to the same standard of reasonable care as lawyers, doctors, architects, and other professional people engaged in furnishing skilled services for compensation. * * * Thus, to recover [a] plaintiff would need to prove a duty (the existence of an accountant-client relationship), the breach of that duty (the failure of the accountants to discharge their duty of reasonable care), factual causation (that "but for" the advice plaintiff would not have made transfers), proximate causation (that plaintiff's increased tax liability was a foreseeable consequence of defendant's advice), and damages (that plaintiff actually suffered increased tax liability due to defendant's advice).

*Vernon J. Rockler & Co. v. Glickman, Isenberg, Lurie & Co.*, 273 N.W.2d 647, 650 (Minn. 1978).

5. *See, e.g., Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 116 (Minn.1992) ("In a professional malpractice action, the plaintiff must present evidence of the applicable standard of care, and that the standard of care was breached.") (citations omitted); *Rino v. Mead*, 55 P.3d 13, 20 (Wyo.2002) ("[T]he standards as to professional malpractice that we have formerly adopted for medical malpractice, and have extended to legal malpractice, should apply equally in regard to allegations of accountant malpractice."); 4A Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Civil*, Category 80, Profes-

Thus, if the intent of section 544.42 is to avoid the waste of time and money spent on defending against frivolous actions that will ultimately be the subject of a directed verdict, the minimum standards for an affidavit of expert disclosure, sufficient to satisfy the 180–day requirement, must be that the affidavit provide some meaningful information, beyond conclusory statements, that (1) identifies each person the attorney expects to call as an expert; (2) describes the expert's opinion on the applicable standard of care, as recognized by the professional community; (3) explains the expert's opinion that the defendant departed from that standard; and (4) summarizes the expert's opinion that the defendant's departure was a direct cause of the plaintiff's injuries.

In reaching this conclusion, we are guided in part by our consideration of the "borderline cases" in the medical malpractice context under section 145.682. Prior to the amendment of that section to add a cure provision, we struggled with the issue of whether dismissal was justified when an affidavit was timely provided but it failed to fully or technically comply with the statutory requirements. *See, e.g., Sorenson,* 457 N.W.2d at 193. In *Sorenson,* we first announced that "[i]n borderline cases where counsel for a plaintiff identifies the experts who will testify and give[s] some meaningful disclosure of what the testimony will be, there may be less drastic alternatives to a procedural dismissal." *Id., see also Anderson v. Rengachary,* 608 N.W.2d 843, 848–49 (Minn.2000), (recognizing the *Sorenson* "borderline" exception but holding that the case "hardly exemplifie[d] a borderline case because the affidavit has serious deficiencies and does not provide

any meaningful disclosure regarding how the standard of care was violated or what that standard required.").

Brown–Wilbert argues that, by incorporating the detailed facts and conclusions alleged in the complaint, its answers to interrogatories provide enough meaningful information to meet the minimum standards for an affidavit of expert disclosure and thus to satisfy the 180–day requirement. Although we agree that Brown–Wilbert's complaint contains a detailed description of the factual allegations and draws certain legal conclusions, and makes the conclusory allegation that the Accountants breached the standard of care, it does not identify or define any specific accounting standard of care, state how Accountants deviated from that standard of care, or allege how that deviation caused injury. In *Sorenson* we said: "to satisfy the requirements of the [affidavit of expert disclosure], it is not enough simply to repeat the facts in the hospital or clinic record. The affidavit should set out how the *expert* will use those facts to arrive at opinions of malpractice and causation." 457 N.W.2d at 192 (emphasis added). Similarly, answers to interrogatories that merely repeat or incorporate the *attorney's* conclusory allegations about accounting malpractice are not sufficient to meet the minimum standards for an affidavit of expert disclosure.

We hold that Brown–Wilbert's answers to interrogatories were not sufficient to meet the minimum standards to satisfy the 180–day requirement in subdivision 2(2) and 4. Accordingly, we affirm the district

sional Malpractice, Introductory Note at 226 (5th ed. 2006) ("As in the case with claims of medical or legal malpractice, a plaintiff claiming that any other type of professional committed malpractice must typically prove,

first, the existence of the standard of care in that professional community; second, that the professional departed from this standard of care; and, third, that this departure directly resulted in the plaintiff's damages.").

court's dismissal of the accounting malpractice count.

## II.

In *BW–II*, we consider whether the judgment dismissing all counts in *BW–I* had res judicata or claim splitting effects on the counts alleged in *BW–II*. As presented to the district court, the precise issue was whether the finality of the judgment in *BW–I* was suspended during the appeal. But the issue presented to us is somewhat different because the judgment in *BW–I* has now been modified by the court of appeals and the parties did not seek review of that modification.

### A. Res Judicata

■■■ The application of res judicata is a question of law that we review de novo. *Hauschildt v. Beckingham*, 686 N.W.2d 829, 840 (Minn.2004). Res judicata precludes parties from raising subsequent claims in a second action when: "(1) the earlier claim involved the same set of factual circumstances; (2) the earlier claim involved the same parties or their privities; (3) there was a final judgment on the merits; (4) the estopped party had a full and fair opportunity to litigate the matter." *Id.* Res judicata applies equally to claims actually litigated and to claims that could have been litigated in the earlier action. *State v. Joseph*, 636 N.W.2d 322, 327 (Minn.2001).

Accountants argue that the court of appeals erred in holding that the judgment in *BW–I* was not final and therefore did not bar the complaint in *BW–II* under the doctrine of res judicata. They argue that, under Minnesota precedent and the majority rule, a judgment becomes final when it is entered in the district court regardless of a pending appeal. We agree with the Accountants' analysis to this point.

This court has long held that an appeal does not affect the preclusive nature of a judgment. *See, e.g., Wegge v. Wegge*, 252 Minn. 236, 238, 89 N.W.2d 891, 892 (1958) (stating that "where judgment has been entered and the appeal has been taken therefrom * * * the judgment is not vacated or annulled but remains res judicata until, and unless, it is reversed"); *Wilcox Trux, Inc. v. Rosenberger*, 169 Minn. 39, 43, 209 N.W. 308, 310 (1926) (stating that an appeal "did not affect the judgment as a bar"); *Schoonmaker v. St. Paul Title & Trust Co.*, 152 Minn. 94, 98, 188 N.W. 223, 224 (1922) ("Even where an appeal has been taken, the matters determined by the judgment remain res judicata until the judgment is reversed."); *State v. Spratt*, 150 Minn. 5, 7, 184 N.W. 31, 32 (1921) ("An appeal with a supersedeas bond does not vacate or annul the judgment appealed from, and the matters determined by it remain res judicata until it is reversed.").

Brown–Wilbert argues that the court of appeals holding to the contrary, that the finality of a judgment is suspended by an appeal, is fully supported by decisions of this court. It first discusses *Holen v. Minneapolis–St. Paul Metro. Airports Comm'n*, 250 Minn. 130, 136, 84 N.W.2d 282, 287 (1957), and suggests that *Holen* overruled all cases that had previously held that an appeal did not alter the finality of a judgment. But *Holen* only addressed the issue of what "pending" means with respect to the retroactive application of changes in the law to cases that are "pending" when the change occurs. *See id.* Brown–Wilbert also cites *State v. Lewis*, 656 N.W.2d 535, 537–38 (Minn. 2003); *Brezinka v. Bystrom Brothers, Inc.*, 403 N.W.2d 841, 843 (Minn.1987); and *County of Hennepin v. Brinkman*, 378 N.W.2d 790, 792–93 (Minn.1985), as support for its contention that *Holen* established a new rule. But *Lewis* only discussed the meaning of the term "pending"

with respect to retroactivity, 656 N.W.2d at 537–38; *Brinkman* discussed the meaning of the term "pending" with respect to the effect of a repealed statute, 378 N.W.2d at 792–93; and *Brezinka* specifically said that the law of the case, res judicata, and stare decisis, while sharing similar policy considerations, were all distinct doctrines and applied the law of the case doctrine without addressing res judicata, 403 N.W.2d at 843. None of these cases addresses the issue of finality for the purposes of the application of res judicata.[6]

Lastly, Brown–Wilbert cites *Joseph*, 636 N.W.2d at 328, where we said "when judgment was entered and the time for appeal from that judgment expired, the judgment became a final judgment on the merits." But *Joseph* is not controlling because it only involved the issue of whether the "judgment was on the merits," not whether it was "final." *See id.*[7]

■ Accordingly, we reaffirm our prior decisions that, for res judicata purposes, a judgment becomes final when it is entered in the district court and it remains final, despite a pending appeal, until it is reversed, vacated or otherwise modified. We recognize that this rule presents the somewhat awkward possibility that a judgment that is given res judicata effect in a second action may later be reversed on appeal. But this difficulty can be avoided or minimized. As suggested by one authority:

Substantial difficulties result from the rule that a final trial court judgment operates as res judicata while an appeal is pending. The major problem is that a second judgment based upon the preclusive effects of the first judgment should not stand if the first judgment is reversed. In some cases, litigants and the courts have collaborated so ineptly that the second judgment has become conclusive even though it rested solely on a judgment that was later reversed. This result should always be avoided, whether by delaying further proceedings in the second action pending conclusion of the appeal in the first action, by a protective appeal in the second action that is held open pending determination of the appeal in the first action, or by direct action to vacate the second judgment.

18A Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4433, at 88–89 (2d ed. 2002) [hereinafter *Federal Practice and Procedure*]. Brown–Wilbert did file a protective appeal of *BW–II*, and we granted further review of that appeal so that the two cases could be coordinated.

■ This brings us to the impact on *BW–II* of the modification of the judgment in *BW–I* after the complaint in *BW–II* had already been dismissed. Because the district court faced a final judgment in *BW–I* dismissing all counts arising out of the common basic facts, the district court was

---

**6.** Brown–Wilbert also cites to *Indianhead Truck Line, Inc. v. Hvidsten Transp. Inc.*, 268 Minn. 176, 183–84, 128 N.W.2d 334, 340–41 (1964), but that case focuses on the interpretation of the term "final order" in a contract and in a specific statute that governed appeals from the Railroad and Warehouse Commission. It likewise is not relevant to res judicata.

**7.** The rule that the finality of a judgment, for res judicata purposes, is not defeated by a

pending appeal, is well established in the federal courts, stemming from *Deposit Bank v. Frankfort*, 191 U.S. 499, 510–11, 24 S.Ct. 154, 48 L.Ed. 276 (1903). For a listing of federal cases, *see* 18A Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4433 (2d ed. 2002). For states following this rule, *see Judgment on Res Judicata Pending Appeal or Motion for New Trial, or During the Time Allowed Therefor*, 9 A.L.R.2d 984 (1950).

correct in dismissing *BW–II* on res judicata grounds. But that situation has changed because of the modification of the judgment in *BW–I*. And Brown–Wilbert's protective appeal enables us to consider the effect of that modification in this appeal.

We agree with the district court that the judgment in *BW–I* was final when entered in the district court, and that, as then constituted, the judgment barred the claims in *BW–II*. But we conclude that the reversal of that judgment in *BW–I* as to the counts that were not expressly based on accounting malpractice means that the judgment in *BW–I* is no longer "on the merits" of the counts that are alleged in *BW–II*. The only portion of the *BW–I* judgment that is both final and on the merits is the dismissal of the accounting malpractice count.

Although the other counts alleged in *BW–I* have been remanded to the district court to consider whether they should likewise be dismissed under section 544.42, subdivision 6, no such dismissal has yet been entered. And the dismissal of the accounting malpractice count was based on the failure to satisfy a procedural condition that, thus far, has only been held to apply to that count. Thus, as one authority states:

> In ordinary circumstances a second action on the same claim is not precluded by dismissal of a first action for * * * failure to satisfy a precondition to suit. No more need be done than * * * switch to a different substantive theory that does not depend on the same precondition.
> * * * *
> Dismissal for failure to satisfy a procedural precondition should be treated in the same way as dismissal for failure to satisfy substantive preconditions. The dismissal is not an adjudication on

the merits that would bar assertion of the same claim * * * in a forum that does not require the same precondition * * *.

*Federal Practice and Procedure, supra,* § 4437, at 180, 184; *see also* Restatement (Second) of Judgments § 20(2) (1982).

Accordingly, we hold that *BW–II* is not barred by res judicata and we affirm the court of appeals' reversal of the district court's dismissal.

### B.  Claim Splitting

■ As an alternative to their res judicata defense, Accountants argue that the district court's dismissal of *BW–II* was proper because of the prohibition against splitting a cause of action. The court of appeals held that the defense of claim splitting was not separate from the defense of res judicata. *BW–II*, 715 N.W.2d at 489. We conclude that the issue focuses more precisely on the nature of the relief sought. Where a dismissal with prejudice is sought, claim splitting supports that remedy only if the elements of res judicata are also present. In that context, the claim splitting defense is redundant. But where a dismissal without prejudice or a stay is sought, claim splitting may be considered as an abatement defense even though the elements of res judicata are not present.

Our case law has discussed claim splitting only in the context of a request for a dismissal with prejudice of the second action, and then has generally done so as an application of the doctrine of res judicata. Thus, in *Mattsen v. Packman,* we addressed the issue of whether a party could split an automobile accident claim so that the first claim could be heard in conciliation court and the second claim, for personal injury and property damage, in district court. 358 N.W.2d 48, 49 (Minn.

1984). In essence, the plaintiff was asking us to carve out an exception to the res judicata doctrine for conciliation court judgments to allow him to "split a single, indivisible claim or cause of action into two separate and distinct claims." *Id.* at 50. We declined to make such an exception, acknowledging that "[f]or more than 100 years Minnesota has consistently applied the principle of res judicata." *Id.*; for other examples of this court's application of res judicata, see *Hauschildt*, 686 N.W.2d at 840–41 (analyzing the defense of claim splitting under the res judicata doctrine, concluding that the second action could proceed because the claims were not identical); *Loo v. Loo*, 520 N.W.2d 740, 744 n. 1 (Minn.1994) ("Res judicata, or claim preclusion, prevents parties from splitting claims into more than one lawsuit and precludes further litigation of the same claim."); *Hauser v. Mealey*, 263 N.W.2d 803, 807–08 (Minn.1978) (analyzing the defense of claim splitting under the doctrine of res judicata but declining to apply res judicata to claims that could not have been brought in the first action because of the limited jurisdiction of county courts); *Youngstown Mines Corp. v. Prout*, 266 Minn. 450, 466, 124 N.W.2d 328, 340 (1963) (stating that a second action was barred after judgment was entered in the first action).

The Restatement also confirms that the rule against splitting a claim is, at least in part, an application of the doctrine of res judicata: "When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the *rules of merger or bar* * * *, the claim extin-guished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1) (1982) (emphasis added).

We have not found any Minnesota cases that have approved a dismissal with prejudice of an action based on a defense of claim splitting where res judicata would not also apply. There is some indirect support for Accountants' argument that claim splitting is a separate defense. In *Kulinski v. Medtronic Bio–Medicus, Inc.*, 577 N.W.2d 499, 503–04 (Minn.1998), we were asked to interpret Minnesota's savings statute with respect to a contract claim. We said that:

> Bio–Medicus warns that such a broad reading of Minnesota's savings statute will lead to rampant claim-splitting. While claim-splitting is greatly disfavored, *see, e.g., Hauser*, 263 N.W.2d at 807, we think it quite unlikely that a plaintiff will be so foolhardy as to gamble upon recovering judgment and having it "arrested or reversed on error or appeal," by asserting only some of his or her potential claims. Moreover, as we noted above, the doctrine of res judicata operates as an additional constraint upon the application of [Minn.Stat. § ]541.18.

*Id.* at 504. The statement that the doctrine of res judicata operates as an additional constraint, could be read as suggesting that claim splitting is a separate defense from res judicata.[8] Further, in

---

**8.** *See also Dean v. St. Paul & Duluth R.R. Co.*, 53 Minn. 504, 507, 55 N.W. 628, 628–29 (1893) (stating that a single demand cannot be split up, without any mention of res judicata); *Pierro v. St. Paul & N. Pac. Ry. Co.*, 39 Minn. 451, 453, 40 N.W. 520, 521 (1888) (stating that "[o]ne may not split an entire, complete cause of action, and have several recoveries of damages" without any mention of res judicata). But in *Pierro*, the second action was dismissed *after* the first action had gone to judgment, so the elements of res judicata were present. *Pierro*, 39 Minn. at 452, 40 N.W. at 521.

*Charboneau v. American Family Insurance Co.,* we discussed the rule against claim splitting, without any mention of res judicata, in determining whether the claimant could split her no-fault insurance claim to meet jurisdictional limits:

> This court has long followed the general rule that a party to court litigation may not split a cause of action. *Hauser v. Mealey,* 263 N.W.2d 803, 807 (Minn. 1978). This rule applies equally to bringing two lawsuits with slightly different theories of recovery * * *.
>
> The rule against splitting a cause of action is intended to avoid a multiplicity of lawsuits and wasteful litigation. The rule is a judge-made rule.

481 N.W.2d 19, 21 (Minn.1992) (internal citations omitted). But *Kulinski* and *Charboneau* do not support the conclusion that claim splitting is a separate ground on which to base a dismissal with prejudice. Both *Kulinski* and *Charboneau* cite to *Hauser* for the rule on claim splitting, and *Hauser* suggests that a dismissal with prejudice would only be appropriate on grounds of res judicata, stating:

> The effect of res judicata on a judgment or final order has at least two distinct and important aspects: (1) merger or bar; and (2) collateral estoppel. The principles of merger and bar operate where a subsequent action or suit is predicated on the same cause of action which has been determined by a judgment, no matter what issues were raised or litigated in the original cause of action. * * *
>
> It is well established in Minnesota that a party "should not be twice vexed for the same cause, and that it is for the public good that there be an end to litigation." To that end, a plaintiff may not split his cause of action and bring successive suits involving the same set of factual circumstances.

*Hauser,* 263 N.W.2d at 806–07 (quoting *Shimp v. Sederstrom,* 305 Minn. 267, 270, 233 N.W.2d 292, 294 (1975)). And *Kulinski* involved the dismissal of the second action after the first action had gone to judgment. *Kulinski,* 577 N.W.2d at 500–01. Finally, *Kulinski* and *Charboneau* were influenced to a large degree by the legislative intent behind the respective statutes they were enforcing. *Kulinski,* 577 N.W.2d at 502–03; *Charboneau,* 481 N.W.2d at 22–23. For example, in *Charboneau* we concluded that "splitting a no-fault claim depreciates the legislature's decision to set a jurisdictional limit." 481 N.W.2d at 21.

■ Accountants cite to *Boland v. Morrill,* 275 Minn. 496, 502, 148 N.W.2d 143, 148 (1967), *rev'd on other grounds, Busch v. Busch Construction, Inc.,* 262 N.W.2d 377, 401–02 (Minn.1977), to support their argument that claim splitting is separate from res judicata. Although that case did not discuss res judicata, the authority it cites for support was based on res judicata. *Boland,* 275 Minn. at 503, 148 N.W.2d at 148 (citing *Myhra v. Park,* 193 Minn. 290, 295, 258 N.W. 515, 518 (1935) (acknowledging that res judicata involves the basic rule prohibiting claim splitting)). Accordingly, based on our review of Minnesota case law, we conclude that the prohibition against claim splitting would support a dismissal with prejudice of the second claim only where the elements of res judicata are also present.

Accountants ask this court to "join the California Supreme Court in recognizing that the prohibition against claim splitting functions as a rule of abatement as well as a rule of res judicata." In *Hamilton v. Asbestos Corp.,* 22 Cal.4th 1127, 95 Cal. Rptr.2d 701, 998 P.2d 403, 414 (2000), the California court said, "[t]he rule against splitting a cause of action * * * is in part a rule of *abatement* and in part a rule of

*res judicata.*" The court went on to explain that the rule of abatement is applicable "if the first suit is still pending when the second suit is filed," whereas the rule of res judicata is applicable "if the first suit has terminated in a judgment on the merits adverse to the plaintiff." *Id.* Accountants argue that the rule of abatement is applicable here and that it should support the district court's dismissal of *BW–II* with prejudice.

■■■ But, under the California decision, abatement and res judicata lead to separate remedies. *Id.* Generally, if a party seeks abatement, the proper remedy is not a dismissal with prejudice, but a stay of proceedings or a dismissal without prejudice.

> The fundamental distinction between defenses in abatement and those on the merits is generally that a decision abating a pending action does not bar a future action on the same cause, while a judgment on the merits concludes the action. * * * A defense in abatement is dilatory in nature and is intended to defeat the particular action because that action has been improperly brought in some respect that does not go to the merits of the cause of action. Allowance of this defense amounts to a dismissal without prejudice of the abated action.

1 Am.Jur.2d *Abatement, Survival, and Revival* § 2 (2005) (internal footnotes omitted).

■■■ Because the dismissal of *BW–II* with prejudice would be an inappropriate remedy for claim splitting, we affirm the court of appeals' reversal of the dismissal of *BW–II* with prejudice. Our decision does not preclude Accountants from moving to stay *BW–II* or for dismissal without prejudice, on claim splitting grounds. In this connection, Brown–Wilbert acknowledged at oral argument that it did not intend to maintain two separate actions,

and it brought *BW–II* as a separate action only because *BW–I* had been dismissed with prejudice, was on appeal, and was not then within the district court's jurisdiction. Without expressing any opinion on the merits of the various motions that could be made to the district court on remand, we do not intend to foreclose the possibility that Brown–Wilbert may move to amend *BW–I* to incorporate the counts now contained in *BW–II* or to consolidate the two cases, and that Accountants may oppose those motions, move to dismiss all counts of *BW–I* and *BW–II* as being subject to section 544.42, subdivision 6, or move to abate *BW–II*.

Affirmed.

Concurring in part, dissenting in part, ANDERSON, PAUL H., and PAGE, JJ.

ANDERSON, PAUL H., Justice (concurring in part, dissenting in part).

I respectfully dissent as to part of the majority opinion. While I agree with most of what the majority holds, I disagree with its conclusion that the answers of appellants Brown–Wilbert, Inc., and Christopher Chandler Brown (Brown–Wilbert) to the interrogatories of respondents Copeland Buhl & Company and Lee Harren (Accountants) were not sufficient to meet the requirements of Minn.Stat. § 544.42, subds. 2, 4 (2006). The specific details in Brown–Wilbert's complaint citing the Accountants' allegedly improper actions, together with the information in Brown–Wilbert's timely answers to the Accountants' interrogatories, which answers explicitly cross-referenced the complaint, provide a sufficient basis to conclude that Brown–Wilbert is entitled to have 60 additional days to cure any deficiencies in its efforts to meet the requirements of section 544.42, subdivision 2. Therefore, I would reverse

the district court's dismissal of Brown–Wilbert's accounting malpractice count.

To provide context to my reasons for dissenting, a short review of the salient parts of the procedural history of the litigation is in order. This action stems from an earlier dispute between appellant Christopher Chandler Brown and his father, Jerry Brown, over the ownership of Brown–Wilbert, Inc. Christopher Brown eventually settled with his father in that dispute and became the sole owner of Brown–Wilbert, Inc. On March 10, 2004, Brown–Wilbert, Inc., and Christopher Brown initiated this action against the accounting firm of Copeland Buhl & Company and Lee Harren, one of the firm's partners. At issue in the underlying action is whether the Accountants, who were employed by Brown–Wilbert, Inc., improperly sided with Jerry Brown in the latter's attempt to "squeeze" Christopher Brown out of any ownership interest in Brown–Wilbert, Inc.

Brown–Wilbert's complaint against the Accountants included four separate claims—(1) breach of contract, (2) breach of fiduciary duty, (3) accounting malpractice, and (4) restitution of fees paid. No counsel's affidavit of expert review accompanied the complaint, nor did Brown–Wilbert claim it could not obtain expert review before the expiration of the statute of limitations. Nevertheless, the Accountants did not assert the lack of this first affidavit as an affirmative defense in their answer. The Accountants, however, did assert that Christopher Brown's release of and agreement to indemnify his father Jerry Brown against any claims made by the Accountants barred any suit by Christopher Brown against them.

On May 18, 2004, the Accountants served Brown–Wilbert with interrogatories, including an interrogatory asking Brown–Wilbert to:

Set forth the following for each person whom you expect to call as an expert witness at trial: (a) State the expert's name, professional or business address and the employer's name; (b) State the expert's area of expertise and the basis for that expertise; (c) Provide a list of the expert's publications, papers and treatises, speeches, lectures and seminars; (d) State the subject matter on which the expert is expected to testify; (e) State the substance of the facts and opinions to which the expert is expected to testify; (f) Give a summary of the individual grounds for each opinion; and (g) Set forth the author, publisher, title and date of publication of each learned treatise upon which the expert will rely in testimony.

The interrogatory did not specifically demand a counsel's affidavit of expert review and did not reference the requirements contained in section 544.42.

Brown–Wilbert answered the interrogatories within 31 days—on June 18—and in its answers identified two expert witnesses it had retained. The answers stated that each expert was expected to testify "as to the conclusions set forth in the Complaint, based upon the facts alleged in the Complaint," and attached curriculum vitae for each expert. One vitae showed it had been e-mailed to Brown–Wilbert's counsel on February 27, 2004—about two weeks before service of the complaint—and the other had been printed out on June 17, 2004.

The Accountants did not object to Brown–Wilbert's interrogatory answers as being deficient nor did they move to compel Brown–Wilbert to supplement its answers; rather, the Accountants waited until September 21, 2004, 195 days after service of the complaint, and then moved to dismiss the complaint on grounds that Brown–Wilbert had failed to comply with

section 544.42. Because more than 180 days had elapsed since the service of the complaint, the Accountants argued that Brown–Wilbert's failure to serve the 180–day affidavit of expert identification (second affidavit) as required by section 544.42, subdivision 2(2), could not be cured. The Accountants also asserted that in their May 18 interrogatories they had made a demand on Brown–Wilbert for the first affidavit—counsel's affidavit of expert review—required by section 544.42, subdivision 2(1), and that Brown–Wilbert had failed to respond to this demand. On October 15, 2004, a date within 60 days of the Accountants' motion to dismiss, Brown–Wilbert supplied an affidavit of its counsel, attesting that the allegations of the complaint had been reviewed by the two experts and purporting to set out the opinions to which the experts were expected to testify.

The district court found that the Accountants' May 18 interrogatory constituted a demand for counsel's affidavit of expert review—the first affidavit. The court found that Brown–Wilbert did not provide the required first affidavit until October 15, 2004, which was outside the 60–day cure period provided for in the statute. Based on this finding, the court, apparently believing that each count of Brown–Wilbert's complaint required expert testimony, dismissed the complaint in its entirety.

In addition to its dismissal based upon the first affidavit, the district court went on to state that Brown–Wilbert's June 18 answers to interrogatories could not constitute the required second affidavit because they "fail to identify the experts, state their opinions, and state the basis of these opinions as required by statute." The court also concluded that the October 15, 2004, affidavit of counsel could not satisfy the second affidavit requirement because the October 15 affidavit was served more than 180 days after the complaint was served. The court did not decide the effect of the release between Christopher Brown and his father. The Minnesota Court of Appeals affirmed in part and reversed in part, but it did affirm the dismissal of the accounting malpractice claim.

Our court has now held that the district court erred when it concluded that the Accountants' May 18 interrogatories constituted a demand for the first affidavit and we have concluded that no such demand was made until the Accountants' September 21, 2004, motion to dismiss. Accordingly, we have concluded that Brown–Wilbert's October 15, 2004, affidavit of expert review was timely and Brown–Wilbert's failure to provide this first affidavit cannot constitute the basis for a dismissal. I agree with this result.

But I disagree with the result of the next step of the majority's analysis. More particularly, I disagree with how the majority answers the question of what are the standards for the second affidavit, i.e., what information is sufficient to minimally satisfy the statute's 180–day requirement and thus entitle a plaintiff to a notice of any deficiencies and an additional 60 days to meet the statutory requirement. Here, the majority rejects a meaningful good faith attempt standard, which standard was articulated by the federal district court—albeit in dicta—in *House v. Kelbel*, 105 F.Supp.2d 1045, 1053 (D.Minn.2000). Instead, the majority adopts a very narrow standard that is designed only to avoid "the dismissal of meritorious claims over *minor technicalities*." (Emphasis added.)

I conclude that there is great potential for unfairness and unduly harsh results that will follow the implementation of the majority's narrow standard. Here, I can only repeat what I said in *Lindberg v.*

*Health Partners, Inc.*, 599 N.W.2d 572 (Minn.1999), a case involving medical malpractice actions and the affidavit requirements of Minn.Stat. § 145.682 (1998). In *Lindberg*, I noted that

> the majority fails to acknowledge our direction in *Sorenson* for courts to use measures less drastic than procedural dismissal in those borderline cases where there has been some meaningful disclosure and there is an absence of prejudice. *See Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 193 (Minn.1990). It is important that we continue to acknowledge there are borderline cases where the application of the statute will not be uncomplicated and unambiguous and where the border will be indeterminate rather than sharp and clean. In those cases, we must continue to evaluate the degree of prejudice caused by inadequate disclosures and in those borderline cases where prejudice is absent, apply less drastic alternatives than procedural dismissal. This approach preserves "the primary objective of the law [ ] to dispose of cases on the merits." *Id.* at 192.

*Lindberg*, 599 N.W.2d at 579 (Anderson, Paul H., J., concurring).

In *Lindberg*, we dismissed the plaintiff's medical malpractice action; but I find it interesting and instructive that after we decided *Lindberg* and, seven months later, reached a similar result in *Anderson v. Rengachary*, 608 N.W.2d 843 (Minn.2000), the legislature passed a 60–day curative provision for medical malpractice actions that is similar to the curative provision contained in Minn.Stat. § 544.42, subd. 6 (2006). *See* Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws. 1706, 1706–07 (codified at Minn.Stat. § 145.682, subd. 6 (2006)). I interpret this legislative action and the parallel existence of section 544.42, subdivision 6, as a sure sign that the statutory provision for a curative supplemental affidavit exists not only to address "minor technicalities," but rather to effectuate legislative intent and judicial policy to dispose of cases on their merits. I believe the legislative action is an acknowledgment and acceptance of our admonition in *Sorenson* that courts are to consider and utilize less drastic alternatives than dismissal when a plaintiff has identified experts and given some meaningful disclosure of the expert's testimony. Accordingly, by applying a meaningful good faith standard, I would conclude that Brown–Wilbert is entitled to submit a supplemental affidavit under section 544.42, subdivision 6; that it has done so with its October 15, 2004, affidavit; and that this case should be remanded to the district court for a decision on its merits.

The result that I would reach does not, however, completely allay my concerns with the majority's holding. Even applying its narrow standard, I conclude that, as applied to the facts here, the majority's holding is too harsh. I conclude that, even when using the standard articulated by the majority, Brown–Wilbert is entitled to relief. Moreover, the result reached by the majority of our court today provides a good example of why the majority's standard as applied will result in the harsh results I alluded to earlier.

I agree with the majority's position that Brown–Wilbert has not fully complied with section 544.42, subdivision 4, but I do not agree with the majority's conclusion that Brown–Wilbert's answers to the interrogatories with their cross-reference to the complaint do not sufficiently identify an "accounting standard of care, state how Accountants deviated from that standard of care, or allege how that deviation caused injury." While Brown–Wilbert's complaint may not be held up as a model for good pleading, it is factual, detailed, often read-

ing like a novel, and quite explicit in its articulation of what the Accountants allegedly did wrong and how they acted improperly.

More particularly, Brown–Wilbert's complaint alleges that the Accountants:

(1) did not bring critical issues to the attention of Christopher Brown;

(2) did not act independently and acted contrary to the interests of Brown–Wilbert's majority stockholder—Christopher Brown;

(3) improperly singled out Christopher Brown for investigation in order to "squeeze Chris out of [Brown–Wilbert]";

(4) improperly favored the interests of Jerry Brown;

(5) were complicit with Jerry Brown in permitting Jerry Brown to improperly convert corporate assets for his own use;

(6) assisted the improper activities of Jerry Brown, overlooked key facts when conducting annual audits, and did not disclose those key facts to Christopher Brown;

(7) conspired with Jerry Brown to force Christopher Brown into insolvency so Christopher Brown would be forced to sell his interest in Brown–Wilbert, Inc.;

(8) provided Christopher Brown with inaccurate and misleading financial data and other information in an effort to get Christopher Brown to sell to Jerry Brown at a low price;

(9) joined with Jerry Brown in denying Christopher Brown access to corporate documents and changing the locks to the Brown–Wilbert building so that Christopher Brown was "locked out of his company";

(10) in essence, improperly advised Christopher Brown that he had "resigned his position as President of [Brown–Wilbert]" which would trigger application of the terms of a buy-sell agreement;

(11) "threatened" Christopher Brown with adverse financial consequences if he did not accept Jerry Brown's buyout offer;

(12) withheld corporate information that was essential for Christopher Brown to make any buyout decision;

(13) although prohibited by several corporate documents, arranged with Jerry Brown to replace one bank with another bank as Brown–Wilbert, Inc.'s, prime lender; then used the refinancing arrangement in an effort to force Christopher Brown to make an early repayment of an "off balance sheet" loan; and then promised the new bank, without Christopher Brown's knowledge or consent, that Christopher Brown's interest in Brown–Wilbert, Inc., would be bought out or, in the alternative, Christopher Brown would pledge his shares in Brown–Wilbert, Inc., to the new bank;

(14) provided Christopher Brown with inaccurate and misleading information, overstated the amounts owed by Christopher Brown to Brown–Wilbert by almost $60,000, and manipulated documentation relating to Christopher Brown's corporate debt;

(15) acted as if it was part of Brown–Wilbert's management team with Jerry Brown despite the "duties the Accountants owed to Chris as [Brown–Wilbert's] majority shareholder";

(16) "led the way in mismanaging [Brown–Wilbert]" and did so in the form of "excess expenses, increased leverage, lost profits, and lost value" in an amount to be proven at trial;

(17) improperly accepted personal payments from Jerry Brown;

(18) made false statements in court that adversely affected Christopher Brown's interests;

(19) accepted forged documents and utilized them to the detriment of Christopher Brown; and

(20) had a duty to Brown–Wilbert and its majority shareholder Christopher Brown and breached that duty, which breach constituted a breach of the standard of care expected of accountants in similarly-situated metropolitan areas.

Brown–Wilbert then answered the Accountants' May 18 interrogatories as follows:

Set forth the following for each person whom you expect to call as an expert witness at trial:

(a) State the expert's name, professional or business address and the employer's name;

Rob Tautges, Tautges Redpath, Ltd., * * * William R. Legier, Legier & Materne * * *

(b) State the expert's area of expertise and the basis for that expertise;

Both experts are Certified Public Accountants, among other things. Mr. Legier is also a Certified Fraud Examiner. See the curriculum vitae and related materials for each attached hereto.

(c) Provide a list of the expert's publications, papers and treatises, speeches, lectures and seminars;

For a partial list, see the attached documents. Plaintiffs will supplement this Answer as necessary. Discovery is continuing.

(d) State the subject matter on which the expert is expected to testify;

Both experts have been recently retained. Mr. Tautges' firm, Tautges Redpath, Ltd., serves as the current Certified Public Accountant for Brown–Wilbert, Inc. Both experts are expected to testify as to the *conclusions* set forth in the Com-

plaint, based upon the facts alleged in the Complaint. Plaintiffs will supplement this Answer as necessary. Discovery is continuing.

(e) State the substance of the facts and opinions to which the expert is expected to testify;

Both experts have been recently retained. Mr. Tautges' firm, Tautges Redpath, Ltd., serves as the current Certified Public Accountant for Brown–Wilbert, Inc. Both experts are expected to testify as to the *conclusions* set forth in the Complaint, based upon the facts alleged in the Complaint. Plaintiffs will supplement this Answer as necessary. Discovery is continuing.

(f) Give a summary of the individual grounds for each opinion; and

Both experts have been recently retained. Mr. Tautges' firm, Tautges Redpath, Ltd., serves as the current Certified Public Accountant for Brown–Wilbert, Inc. Both experts are expected to testify as to the *conclusions* set forth in the Complaint, based upon the facts alleged in the Complaint. Plaintiffs will supplement this Answer as necessary. Discovery is continuing.

(g) Set forth the author, publisher, title and date of publication of each learned treatise upon which the expert will rely in testimony.

For a partial list, see the attached materials. Discovery is continuing.

(Italics added.)

Brown–Wilbert's answers to interrogatories were submitted in a timely manner 100 days after its action was commenced and within 31 days after the Accountants' interrogatories were served; its supplemental affidavit was submitted within 60 days of the Accountants' motion to dismiss.

Further, the answers identified two expert witnesses, cited to a complaint that was factually detailed, identified numerous allegedly improper acts by the Accountants that caused Brown–Wilbert damage, and made several conclusions on causation. The answers also stated that the experts were "expected to testify as to the conclusions set forth in the Complaint." Thus, I conclude that when the majority focuses on a narrow standard dealing with minor technicalities to dismiss Brown–Wilbert's action, it has lost sight of the proper focus of section 544.42.

While Brown–Wilbert was by no means in perfect compliance with the requirements of section 544.42, I conclude that Brown–Wilbert has sufficiently met the standards for its second affidavit—the affidavit of expert disclosure—to be minimally sufficient to satisfy the 180–day requirement. Therefore, even under the narrow standard articulated by the majority, I would conclude that Brown–Wilbert was entitled to submit a supplemental affidavit under section 544.42, subdivision 6, that it has done so, and is entitled to a remand for a trial on the merits.

PAGE, Justice (concurring/dissenting).

I join in the concurrence/dissent of Justice Paul H. Anderson.